# REDACTED VERSION FOR PUBLIC FILING

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

William J. O'Shaughnessy, Esq.
Jonathan M.H. Short, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

Of Counsel:
Dominick A. Conde, Esq.
William E. Solander, Esq.
Colleen Tracy, Esq.
Peter D. Shapiro, Esq.
FITZPATRICK, CELLA, HARPER &
SCINTO
30 Rockefeller Plaza
New York, New York 10112
(212) 218-2100

Attorneys for Plaintiffs,
SANOFI-AVENTIS U.S. LLC, SANOFI-AVENTIS,
and DEBIOPHARM S.A.

| | | |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC,<br>SANOFI-AVENTIS,<br>DEBIOPHARM S.A.<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>SANDOZ, INC.,<br><br>Defendant/Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.:<br>3:07-cv-02762-JAP-JJH<br>Consolidated 3:08-cv-02693-JAP-JJH |
| SANOFI-AVENTIS U.S. LLC,<br>SANOFI-AVENTIS,<br>DEBIOPHARM, S.A.,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.:<br>3:07-cv-03164-JAP-JJH<br><br>**HIGHLY CONFIDENTIAL<br>INFORMATION -<br>OUTSIDE COUNSEL ONLY** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## <u>OF INVALIDITY OF THE '988 PATENT CLAIMS UNDER 35 U.S.C. § 102</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

    A.    There Were Many Problems with the "Freeze-Dried" Oxaliplatin
Formulation ................................................................................ 4

    B.    Developing a Stable Oxaliplatin Solution Formulation Was a
Significant Accomplishment ................................................... 5

    C.    The '988 Patent Claims ............................................................ 9

ARGUMENT ................................................................................................... 10

I.    Defendants' On-Sale Defense Is Baseless ........................................... 10

    A.    There Was No Commercial Offer For Sale Of The '988 Invention
Before The Critical Date.......................................................... 11

        1.    ███████████████ ................................. 12

        2.    ████████████████████ ...................... 15

        3.    ████████████ .......................................... 16

        4.    The "Ready for Patenting" Inquiry Is Inapplicable ............. 17

II.    Defendants' Anticipation Defense Is Baseless .................................... 18

    A.    Neither the Boughattas Reference Nor the '874 Patent Discloses
Each and Every Element of the Asserted '988 Patent Claims.............. 20

        1.    The Boughattas Reference...................................................... 21

        2.    U.S. Patent No. 5,338,874 ..................................................... 25

    B.    The Kidani and Mathé References Do Not Disclose Stable
Oxaliplatin Solutions, Much Less Solutions That Are Stable for a
Pharmaceutically Acceptable Duration of Time ................... 27

        1.    The Kidani References ............................................................ 28

        2.    The Mathé Reference............................................................... 29

III.    Sandoz's Request That the Court Adopt the Decisions of Foreign
Tribunals Is Inappropriate ................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.,*
212 F.3d 1272 (Fed. Cir. 2000) .................................................................................27

*Atlanta Attachment Co. v. Leggett & Platt, Inc.,*
516 F.3d 1361 (Fed. Cir. 2008) .........................................................................10, 13

*Bright Ideas Co. v. Target Corp.,* 2007 U.S. App. LEXIS 12952 (Fed. Cir.
May 14, 2007) (unpublished opinion) ...............................................................20

*Cont'l Can Co. v. Monsanto Co.,*
948 F.2d 1264 (Fed. Cir. 1991) .................................................................................18

*Elan Corp. v. Andrx Pharms.,*
366 F.3d 1336 (Fed. Cir. 2004) .........................................................................11, 14

*Eli Lilly and Co. v. Barr Labs., Inc.,*
251 F.3d 955 (Fed. Cir. 2001) .................................................................................18

*Elizabeth v. Am. Nicholson Pavement Co.,*
97 U.S. 126 (1877) .................................................................................................10

*Enzo Biochem Inc. v. Gen-Probe, Inc.,*
424 F.3d 1276 (Fed. Cir. 2005) .................................................................................13

*EZ Dock, Inc. v. Schafer Systems, Inc.,*
270 F.3d 1347 (Fed. Cir. 2002) .........................................................................11, 14

*Group One, Ltd. v. Hallmark Cards, Inc.,*
254 F.3d 1041 (Fed. Cir. 2001) .................................................................................14

*Honeywell Int'l Inc. v. Universal Avionics Syst. Corp.,*
488 F.3d 982 (Fed. Cir. 2007) .................................................................................14

*In re Oelrich,*
666 F.2d 578 (C.C.P.A. 1981) .................................................................................19

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.,*
322 F.3d 1335 (Fed. Cir. 2003) .........................................................................10, 11

*Linear Tech. Corp. v. Micrel, Inc.,*
275 F.3d 1040 (Fed. Cir. 2001) .................................................................................10

*Marion Merrell Dow v. American Cyanamid Co.,*
1994 U.S. Dist. LEXIS 11495 (D.N.J. Aug. 12, 1994) .......................................29

*Matsushita Elec. Indus. Co. v. Samsung Elecs. Co.,*
    2006 U.S. Dist. LEXIS 42934 ..................................................................29

*Medtronic, Inc. v. Daig Corp.,*
    789 F.2d 903 (Fed. Cir. 1986) ................................................................29

*Oney v. Ratliff,*
    182 F.3d 893 (Fed. Cir. 1999) ..........................................................18, 19

*Pfaff v. Wells Elecs., Inc.,*
    525 U.S. 55 (1998) ..................................................................10, 11, 14, 17

*Rapoport v. Dement,*
    254 F.3d 1053 (Fed. Cir. 2001) ..............................................................19

*Special Devices, Inc. v. OEA Inc.,*
    270 F.3d 1353 (Fed. Cir. 2001) ..............................................................13

*W.L. Gore & Associates v. Garlock,*
    721 F.2d 154 (Fed. Cir. 1983) ..........................................................19, 22

**Statutes**

35 U.S.C. § 102 ..........................................................................10  18, 27

35 U.S.C. § 119 ......................................................................................10

35 U.S.C. § 282 ......................................................................................18

## INTRODUCTION

This patent infringement case concerns the '988 patent, which covers commercially stable formulations of a blockbuster anti-cancer drug, Eloxatin.[®1] In particular, the '988 patent, which is assigned to Debiopharm S.A. ("Debiopharm"), covers formulations of oxaliplatin and water that are ready to use, and that solved significant problems in the administration of drugs to treat colorectal cancer. Prior to the invention, oxaliplatin was available only in a freeze-dried powder form that had to be prepared prior to administration. This was an inefficient, cumbersome, and potentially dangerous process. For example, busy healthcare workers could mistakenly use a common solvent (saline) to mix oxaliplatin. Because saline quickly degrades oxaliplatin, the resulting preparation would be ineffective in treating cancer.

Defendants have moved for summary judgment,[2] raising two issues concerning the validity of the '988 patent—first, whether that patent is invalid based on the on-sale bar, and second, whether the patent claims are anticipated as a matter of law.

---

[1] Eloxatin is indicated for use in treating colorectal cancer. In 2004, in the United States alone, over 144,000 people were diagnosed with colorectal cancer. (CSOF ¶ 5.) So far in 2008, there have been approximately 50,000 deaths from colorectal cancer and 150,000 newly diagnosed cases of the disease in the United States. (CSOF ¶ 6.)

Citations to CSOF refer to Plaintiffs' Counter Statement of Facts filed concurrently, and citations to RSOF refer to Plaintiffs' Responsive Statements of Fact filed concurrently.

[2] Defendant Sandoz, Inc. ("Sandoz") filed its summary judgment motion on November 17, 2008. Thereafter, Defendants Dabur Oncology Plc., Dabur Pharma Limited, MN Pharmaceuticals, Par Pharmaceutical Co., Inc., and Par Pharmaceutical, Inc. joined Sandoz's motion without further briefing. Defendant Ebewe Pharma Ges.m.b.H Nfg.KG ("Ebewe") also joined Sandoz's motion and filed an additional statement of facts and a separate brief. This opposition responds to the briefs submitted both by Sandoz ("Sandoz Br.") and Ebewe ("Ebewe Br."). "Defendants" refers to all defendants who filed and/or joined Sandoz's motion.

To prevail, Defendants must demonstrate a set of undisputed material facts that clearly and convincingly prove each element of their invalidity defenses.  Defendants have not and cannot meet these requirements, and their motion must fail.

Defendants' on-sale defense relies on a set of documents that, on their very face, disprove the applicability of that defense here.  The law governing this defense requires a "commercial offer for sale" of the patented invention, which, upon acceptance, would create a binding contract for sale of that invention. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

██████████████ ████████████████████████

███████████████████████████████████████████████

███████████

Defendants' anticipation defense suffers from equally egregious and fatal flaws. A patent claim is invalid as anticipated only if every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently.  Defendants rely on two prior art references, the Boughattas reference (a published article) and the '874 patent.  However, neither reference has anything to do with commercial products, let alone commercially stable formulations of oxaliplatin in water.  In both references, a solution of oxaliplatin and water was prepared to conduct animal or analytical testing completed within

days, hours, or minutes of making the solution, and not to prepare a commercial product with a shelf-life of several years as claimed in the '988 patent. It is self-evident that those are entirely different purposes.

Defendants, in fact, have conceded that the references they rely on fail to expressly disclose every element of the '988 patent claims, and they rely instead on the contention that all the limitations are inherently disclosed. To show inherent anticipation, Defendants must prove by clear and convincing evidence that practicing the prior art would always and necessarily result in the claimed invention. Defendants offer no evidence to support this contention, and indeed, there is none.[3] Nothing in the Boughattas reference or the '874 patent would allow one of ordinary skill in the art to make a formulation that was always and necessarily sufficiently stable to act as a commercial product. To the contrary, other researchers whose actual goal, unlike Boughattas and the '874 inventors, was to prepare commercially acceptable formulations of oxaliplatin and water, failed in those attempts. Thus, there is nothing to support Defendants' assertion that the crude solutions disclosed in the references they rely upon could ever meet, as they necessarily must, all of the '988 claim limitations, including the limitation that the solution must have sufficient stability for commercial purposes.

In sum, because the invalidity defenses raised by Defendants in their motions are baseless, these motions for summary judgment should be denied.

---

[3] Plaintiffs have compiled a chart, see Attachment A, that demonstrates the fact that none of these references disclose all of the elements of the asserted claims.

## BACKGROUND

A.   **There Were Many Problems with the "Freeze-Dried"
     Oxaliplatin Formulation**

Pharmaceutical drugs, including colon cancer drugs, must be "formulated" so that they can be administered to patients. (*See, e.g.,* CSOF at ¶¶ 32, 38-46.) For example, some drugs are provided in tablet form, while others are provided as a liquid formulation (*i.e.*, a drug compound that is dissolved in a solvent like water). Before the invention of the '988 patent, Eloxatin® was provided only as a freeze-dried powder (the "lyophilized" form) that needed to be dissolved (reconstituted) in a solvent (*i.e.*, water) before it could be administered to cancer patients. (CSOF ¶ 18.)

In particular, freeze-dried oxaliplatin first needed to be reconstituted in a small volume of solvent to dissolve it. (CSOF ¶ 22.) The dissolved drug was then transferred to an infusion bag containing more liquid. (CSOF ¶ 23.) The contents of the infusion bag were then administered intravenously to the cancer patient. (CSOF ¶ 23.) In performing this multi-step process, both patients and medical staff were exposed to significant potential risks. (CSOF ¶¶ 22-23, 25-28.) Clinicians could be exposed to the oxaliplatin drug substance itself, which is a problem because oxaliplatin can damage DNA in normal cells. (*See* CSOF ¶¶ 29-31.) Patients were put at risk because medical personnel could mistakenly dissolve oxaliplatin in saline, a common solvent used extensively in hospitals. (CSOF ¶¶ 24-25, 27.) Saline, however, quickly destroys oxaliplatin, rendering the compound useless in fighting cancer. (CSOF ¶ 25.)

Also, using freeze-dried oxaliplatin could result in a greater risk for infection because microbial contamination of the drug product could occur either during the freeze-drying process or during the multi-step reconstitution and transfer process described above. (CSOF ¶ 28.) In fact, these well-known difficulties with freeze dried oxaliplatin were recognized by two

of the Defendants in this case, Dabur Pharma Limited ("Dabur") and Mayne Pharma Limited ("Mayne"), in their own patent applications.[4]  (CSOF ¶¶ 27-29, 31).

Because of these serious potential problems with lyophilized oxaliplatin, there existed a clear need for an oxaliplatin formulation that was pre-dissolved and ready to use, thereby eliminating the need for medical personnel to reconstitute oxaliplatin powder before administration to colon cancer patients.

**B.      Developing a Stable Oxaliplatin Solution Formulation Was a Significant Accomplishment**

Developing a formulation of oxaliplatin and water that would be stable for a commercially acceptable period of time (*e.g.*, years) was a significant accomplishment.  Stability of a pharmaceutical product is not a trivial concern.  (CSOF ¶¶ 37-39.)  Because drugs may not be used immediately after they are made, and in fact may remain on the shelf for several years, the FDA requires stability testing of all potential commercial products before they can be approved.  (CSOF ¶ 41.)  In fact, each Defendant conducted a full battery of stability testing

---

[4] According to Dabur, "saline solution[], which is very commonly used in hospitals, if used for such a reconstitution of oxaliplatin lyophilized powder, has the ***serious consequence*** of rapidly decomposing the oxaliplatin metal complex, forming a precipitate . . . ."  (CSOF ¶ 27.) (emphasis added).

According to Mayne,

> The manufacturing process for a lyophilised dosage form is complicated and expensive. For example, the risk of sterility failure during manufacture of freeze dried forms is generally higher than is the case for liquid solutions . . . . Further, following reconstitution, oxaliplatin is prone to instability, particularly in solutions containing certain nucleophilic agents. For example, some reconstitution solutions containing chloride ions, such as 0.9% sodium chloride solution, are commonly used in hospitals. The mistaken use of such a reconstitution solution in the case of the lyophilized form of oxaliplatin has the serious consequence of rapidly decomposing the oxaliplatinum metal complex, forming a precipitate . . . .

(CSOF ¶ 28.)

5

before submitting their Abbreviated New Drug Applications ("ANDAs") to the United States Food and Drug Administration ("FDA") for potential approval of the drug products at issue in this case. (*See* CSOF ¶ 43.)

Thus, pharmaceutical stability is crucial. If a drug product is unstable and degrades, toxic impurities may accumulate, or the drug may lose its efficacy because the active ingredient no longer remains intact. (CSOF ¶ 46.) Obviously, such a drug product would be a poor candidate for FDA approval and would be ineffective for treating patients.

In the case of the liquid formulation of Eloxatin,® several variables can affect stability of the oxaliplatin drug substance, including the solvent, the type of container used, the type of stopper used to seal the container, and the presence of air or other gases trapped inside the container. (CSOF ¶¶ 102-103, 119-120.) These factors had to be addressed in order for scientists at Debiopharm to make an oxaliplatin solution product stable enough to be commercially useful in fighting colon cancer.

Drug formulation stability is tested by well-known standard methods. (CSOF ¶¶ 44-45.) Typically, stability is tested by storing the drug product at various temperatures over a specified period of time, and measuring a number of parameters, including the solution's pH, the amount of drug substance remaining intact in solution, and the accumulation of impurities resulting from drug degradation. (CSOF ¶ 44-45.) Changes in pH, loss of drug substance, and accumulation of impurities would all point to instability. (CSOF ¶¶ 63.) Stability testing also includes determining whether certain vial or stopper materials contribute to the formation of impurities. (CSOF ¶ 14.)

Prior to the '988 invention, no one had been able to develop a commercially acceptable oxaliplatin and water solution. (CSOF ¶¶ 56-57, 64-65.) First, it is well known that

oxaliplatin tends to dissociate (fall apart) when added to water. (CSOF ¶¶ 36-38.)  The more oxaliplatin that dissociates and reacts to form other compounds, the less oxaliplatin remains available to act as an anti-tumor agent. (CSOF ¶ 46).  In other words, the less effective the drug will be.

      The inventors of the '988 patent, therefore, addressed and solved a difficult problem—how to store oxaliplatin in water for a long period of time, while preventing it from dissociating to a point where it would be ineffective as a cancer drug.

      Further, there was the problem that oxaliplatin (as a known reactive drug) could react with its container if an appropriate non-reactive ("inert") container material was not chosen.[5]  (CSOF ¶¶ 47-48.)  Similarly, oxaliplatin can react with the container cover or stopper if the stopper material is not carefully chosen, resulting in the formation of unwanted and possibly toxic impurities.  (CSOF ¶¶ 47-48.)  The inventors of the '988 patent tested different types of stoppers. (CSOF ¶¶ 14-15.)

      A container that is not properly sealed can also promote drug instability.  (CSOF ¶¶ 48-49.)  If a drug vial is not properly sealed and airtight (i.e., "hermetically sealed"), air will enter the container.  (CSOF ¶ 53.)  Air is composed of chemicals in the form of gases like oxygen ($O_2$) and carbon dioxide ($CO_2$), which react with "platin" compounds like oxaliplatin. (CSOF ¶¶ 52-54.)  If such a reaction occurs, it can lead to the formation of impurities and decreased effectiveness.  Thus, the inventors of the '988 patent knew that the container for a solution of oxaliplatin and water must be hermetically sealed so that air cannot enter from the outside environment.

---

[5] Container reactivity occurs in everyday life – for example, acidic foods like lemon juice and tomato sauce are generally not stored in metal containers because they react with metal to form compounds that give food a metallic taste.

In fact, others have attempted to create a stable solution of oxaliplatin in water, but failed. A patent application and two patents assigned on their faces to Pharmacia show that an oxaliplatin in water solution had a pH of 6.7, and the oxaliplatin content in this formulation dropped to 61.9% of the original amount after only three months at accelerated conditions. (CSOF ¶ 73.) These data show that simply dissolving oxaliplatin in water does not result in a solution that is stable for a long period of time or that the solution will have a pH as claimed in the '988 patent (CSOF ¶ 76.)



████████████████████████████████

██████████████████████████

**C.**     **The '988 Patent Claims**

As part of an extensive research and development program, '988 inventors Dr. Rolland-Yves Mauvernay and Dr. Houssam Ibrahim were able to eventually make a commercially acceptable stable formulation of oxaliplatin and water, which is now covered by the '988 patent in suit.  The '988 patent claims state that the invention is a solution of oxaliplatin and water that must be stable for "a pharmaceutically acceptable duration of time."  (CSOF ¶ 9.)

Plaintiffs assert that Defendants' proposed generic products will infringe claims 4, 5, 6, and 8 of the '988 patent.  Claim 4 includes all of the language of claim 1.  (CSOF ¶ 9.) Claims 1 and 4, as combined, read as follows:

> A pharmaceutically stable preparation of oxaliplatinum for the administration by the parenteral route, consisting of a solution of oxaliplatinum in water at a concentration of 1 to 5 mg/ml and having a pH of 4.5 to 6, the oxaliplatinum content in the preparation being at least 95% of the initial content and the solution remaining clear, colorless and free of precipitate after storage for a pharmaceutically acceptable duration of time, [wherein the] aqeuous solution of oxaliplatinum [is] ready to be used and contained in a hermetically sealed ["airtight"] container

(CSOF ¶ 9.)

Claim 5 includes the language of claim 4, and further recites that the dose is between 50 to 100 mg of oxaliplatin, which can be administered by infusion.  (CSOF ¶ 9.) Claim 6 includes the language of claim 1 and further recites that the container is a glass vial for pharmaceutical use, the container is closed with a stopper, and the surface of the stopper that comes in contact with the solution must be inert (*i.e.*, must not chemically react with the drug solution).  (CSOF ¶ 9.)  Claim 8 is an independent claim incorporating the elements of claims 1

9

and 6 and further requiring that the space between the solution and stopper (the "headspace") be filled with an inert (non-reactive) gas.  (CSOF at ¶ 9.)

The Defendants who filed substantive briefs on these motions, Sandoz and Ebewe, ███████████████████████████████████████ ████████████████████████████████ And, as discussed below, Defendants' anticipation defenses are contrived—a transparent attempt to avoid liability for their wrongful use of Plaintiffs' medically important and highly valuable invention.

## **ARGUMENT**

### I.   **Defendants' On-Sale Defense Is Baseless**

As recognized by the very cases Defendants cite to this Court, the purpose of the on-sale bar to patentability is to prevent unjust enrichment of an inventor who "applies for a patent more than one year after making an attempt to profit from his invention by putting it on sale."[6] *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008) (citing 35 U.S.C. § 102(b) and *Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 137 (1877)).  To serve this purpose, the Supreme Court has held that the on-sale bar is governed by a two part test:  "First, the product must be the subject of a commercial offer for sale.  Second, the invention must be ready for patenting."  *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1347 (Fed. Cir. 2003) (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998)) (internal quotation marks and ellipses omitted).  "A § 102(b) [on-sale] determination

---

[6]  Here, the "critical date" is August 8, 1994, one year prior to the filing of the PCT application from which the '988 application claimed priority.  35 U.S.C. §§ 102(b), 119, 363; Sandoz Br. at 8.

is a conclusion of law based on underlying findings of fact." *Id.* (citing *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1047 (Fed. Cir. 2001)).

The Federal Circuit has held that the question whether there is a "commercial offer for sale" is analyzed by applying ordinary principles of contract law as set forth in the Restatement (Second) of Contracts ("the Restatement") and the Uniform Commercial Code ("the U.C.C."). *Elan Corp. v. Andrx Pharms.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004) (citing the Restatement); *Lacks*, 322 F.3d 1335 (Fed. Cir. 2003) (citing the U.C.C.). The "ready for patenting" requirement was adopted for policy reasons, namely, to ensure that a patentee who began to commercially exploit an invention more than a year prior to filing a patent application could not avoid the on-sale bar merely because there was not yet a physical embodiment of the invention. *Pfaff*, 525 U.S. at 55.

Defendants, of course, bear the burden of proving their on sale defense by clear and convincing evidence, and to prevail on this motion, Defendants must show that no material facts are in dispute. *EZ Dock, Inc. v. Schafer Systems, Inc.*, 270 F.3d 1347, 1358 (Fed. Cir. 2002). Also, "during summary judgment, the trial court must weigh all evidence in the record in favor of the non-movant." *Id.* at 1353. Defendants' request for summary disposition of the on sale defense in their favor is inappropriate, at best, and should be rejected.

A.    **There Was No Commercial Offer For Sale**
      **Of The '988 Invention Before The Critical Date**

Defendants' purported on sale defense is based on three collections of documents,

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████



████████████████████████████████████████████████████

████████████████████████████████████, and none of the Defendants' authorities

suggest otherwise.  Indeed, in *Enzo Biochem Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276 (Fed. Cir.

2005) (Sandoz Br., *passim*), the Court acknowledged that the parties' agreement was primarily a

non-commercial research and development agreement, which ordinarily would *not* constitute a

commercial offer for sale.  *Id.* at 1281-82.  The *Enzo* court sustained an on-sale bar to

patentability based on a single contract provision that was "distinctly different" from the rest,

providing for supply of "worldwide requirements" of a completed invention.  *Id.* at 1282.

Defendants' other authorities are similarly inapposite.  *See Special Devices, Inc.*

*v. OEA Inc.*, 270 F.3d 1353, 1355-57 (Fed. Cir. 2001) (on sale bar applied where patentee

*conceded* a commercial offer for sale concerning 20,000 commercial units of an invention for

"commercial stockpiling" by the patentee); *Atlanta Attachment*, 516 F.2d at 1366 (offer to "mass

produce production models" of an invention was a "commercial offer for sale of the invention *en*

*masse*").



In fact, relevant case law recognizes the inapplicability of the on sale bar in circumstances less compelling than those here. *See, e.g., Honeywell Int'l Inc. v. Universal Avionics Syst. Corp.*, 488 F.3d 982, 996-97 (Fed. Cir. 2007) (offer to supply developed invention for tests to determine if it worked for its intended purpose was not a commercial offer for sale where commercial supply would ensue "if and only if, [the] tests were successful"); *see also EZ Dock*, 270 F.3d 1347 (Fed. Cir. 2002) (summary judgment of invalidity due to the on sale bar was improperly granted where a reduced to practice invention was sold to a third party for testing to determine whether it was capable of performing its intended purpose) (citing *Pfaff*, 525 U.S. at 64 (1998) ("an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention.")).

Although the clearly non-commercial nature of relevant provisions of the DMS Contract should end the on-sale inquiry here,[9] it is also pertinent that the law governing what constitutes an offer for sale under §102(b), "leaves no room for activity which does not rise to the level of a formal 'offer' under contract law principles." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001). In fact, Defendants agree that "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under §102(b)." *Id.* at 1048; Sandoz Br. at 9, 13; *see also Elan Corp.*, 366 F.3d at 1341 (holding that "a communication that fails to constitute a definite offer to sell the product and to include material terms is not an 'offer' in the contract sense.").

---

[9] Although Defendants extensively discuss the "experimental use exception" to the on-sale bar (Sandoz Br. at 18-21) the Federal Circuit has made clear that "evidence of experimental use does not give rise to a free-standing doctrinal exception to statutory bars, but instead operates to negate application of section 102(b)." *EZ Dock*, 270 F.3d at 1351 (Fed. Cir. 2002).

Applying these principles here, since no stable liquid oxaliplatin formulation existed, and there was no assurance one ever would, by definition, there was no offer made in the DMS Contract, such that simple acceptance would create a binding agreement for the sale of the invention of the '988 patent.

Also, further evidence of the impossibility of a section 102(b) offer for sale here is found ████████████████████. Significantly, the Restatement has recognized that a "provision for future agreement as to price strongly indicates that the parties *do not* intend to be bound." RESTAT. 2d OF CONTRACTS, § 33(e), Illus. 8. ████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
██████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████





16

4.      **The "Ready for Patenting" Inquiry Is Inapplicable**

Clearly, because there is no evidence here (much less clear and convincing, undisputed evidence) of a commercial offer for sale of the '988 invention, Defendants' on-sale defense must fail, regardless of whether or not the '988 invention was "ready for patenting" before the critical date.  Moreover, the policy considerations that underlie the "ready for patenting" standard compel the conclusion that it is inappropriate even to conduct an inquiry concerning that standard in this case.

The "ready for patenting" prong of the on-sale inquiry, which was first articulated by the Supreme Court in *Pfaff v. Wells Electronics Inc.,* 525 U.S. 55 (1998), was born of the need to serve the underlying purpose of the on-sale bar, namely, to avoid allowing

> an inventor [to acquire] an undue advantage over
> the public by delaying to take out a patent,
> inasmuch as he thereby preserves the monopoly to
> himself for a longer period than is allowed by the
> policy of the law.

*Id.* at 64.  In *Pfaff,* the inventor of the patent-in-suit had accepted prior to the critical date, a written order to sell over 30,000 units of his invention (a computer chip socket) for an agreed price of over $90,000—circumstances that left "no question that the sale was commercial . . . in character." *Id.* at 67.  The only issue in *Pfaff* was whether this "commercial marketing" of the invention (*id.* at 57) avoided the on-sale bar because the patented invention was not actually reduced to practice until after the critical date.[12]

In this context, and to serve the overriding purpose of the on-sale bar, the Supreme Court established the "ready for patenting" standard to prevent an inventor who had

---

[12]   At the time of the commercial offer for sale, the *Pfaff* inventor had no prototype of his invention but had detailed engineering drawings describing the design, dimensions and materials to be used in making the socket, and had testified to the effect that his invention was complete and ready to go straight from the drawings to fabrication.  (*Id.* at 58).

taken clear steps to commercially exploit his invention from avoiding the on-sale bar simply because an actual physical embodiment of the fully-developed invention had yet to be created.

Clearly, then, the *Pfaff* "ready for patenting" inquiry is inappropriate absent circumstances where there is at least some suggestion of an attempt to commercially exploit the invention at issue. Here, where there is a complete absence of indicia of commercial exploitation, the policies underlying both the on-sale bar and the specific issues addressed in *Pfaff* compel the conclusion that the on-sale inquiry in this case should proceed no further.

## II.   **Defendants' Anticipation Defense Is Baseless**

The claims of an issued patent are presumed valid. 35 U.S.C. § 282. For this reason, Defendants bear the burden of proving their anticipation defense by clear and convincing evidence, and to prevail on this motion, they must show that there are no material facts in dispute. *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999).

A patent claim is invalid as anticipated under 35 U.S.C. §§ 102(b) or 102(e) only if "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Sanofi-Synthelabo v. Apotex, Inc.*, No. 2007-1438, slip. op. at 10 (Fed. Cir. Dec. 12, 2008). Further, an anticipating reference must be enabling, *i.e.*, "the description must be such that a person of ordinary skill in the field of the invention can practice the subject matter based on the reference, without undue experimentation."[13] *Id.*

---

[13] Before an enablement analysis is triggered, Defendants must first show that the elements of the '988 patent claims are necessarily present in the cited prior art references. *See W.L. Gore* 721 F.2d at 1554 (Fed. Cir. 1983) (cited in text). Because Defendants cannot make such an initial showing, there is no need to reach the enablement question. In any event, it is abundantly clear that the cited references do not provide any details regarding how to make a stable solution of oxaliplatin in water, and therefore, they do not enable making the invention of the '988 patent.

A reference that is otherwise silent with respect to a claim limitation required to establish an anticipation defense, discloses that limitation inherently only if it is the "'natural result' flowing from the reference's explicitly explicated limitations." *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001) (quoting *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991)). To anticipate inherently, the practice of a prior art reference must always and necessarily result in the claimed invention; occasional anticipation is insufficient. *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981) ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient."); *W.L. Gore & Associates v. Garlock*, 721 F.2d 154, 1554 (Fed. Cir. 1983) (no inherent anticipation where the prior art did not "always" produce the claim limitation.)

Defendants' anticipation defense relies on two prior art references, namely the "Boughattas reference" and U.S. Patent No. 5,338,874 ("the '874 patent"), that indisputably do not expressly disclose each and every element of the claims of the '988 patent.[14] Defendants have conceded as much, and their present motion relies solely upon an impermissible distortion of the principle of inherent anticipation. That is, Defendants simply proclaim, without any supporting evidence, that all of the '988 claim limitations are disclosed inherently in the Boughattas reference and the '874 patent. (Sandoz Br. at 24-30.) Defendants cannot prove, as they must, that the practice of the Boughattas reference and the '874 patent would result in a solution of oxaliplatin in water that is always and necessarily stable for a "pharmaceutically acceptable duration of time." Clearly, the law requires far more than Defendants' bald, unsupported assertions to invalidate the patent-in-suit. *Oney*, 182 F.3d at 895 (party alleging

---

[14] Boughattas. N., *et al.*, *Circadian Rhythm in Toxicities and Tissue Uptake of 1,2-Diamminocylcohexane(trans-l) oxalatoplatinum(II) in Mice*, 49 CANCER RESEARCH 3362-68 (June 15, 1989). As used herein, "the '874 patent" is meant to refer to U.S. Patent No. 5,338,874 and its Japanese and European equivalents.

anticipation must demonstrate it by clear and convincing evidence); *see also Rapoport v. Dement*, 254 F.3d 1053, 1060 (Fed. Cir. 2001) (holding that what a reference teaches is a question of fact)

A.       **Neither the Boughattas Reference Nor the '874 Patent Discloses**
         **Each and Every Element of the Asserted '988 Patent Claims**

The asserted claims of the '988 patent require the following:[15]

- [a] *pharmaceutically stable* preparation of oxaliplatinum in water (all asserted claims)
- at a concentration of 1 to 5 mg/mL (all asserted claims)
- having a pH of 4.5 to 6 (all asserted claims)
- where the oxaliplatinum content in the preparation is at least 95% of the initial content (all asserted claims)
- the solution remaining clear, colorless and free of precipitate after storage for a *pharmaceutically acceptable duration of time* (all asserted claims)
- stored in a hermetically sealed[16] container (claims 4-7)
- at a dose of 50 to 100 mg of oxaliplatinum (claim 5)
- which can be administered by infusion (claim 5)
- in a glass vial (claim 6)
- with an inert stopper (claim 6)
- further comprising an inert gas filling the space ("headspace") between the solution and the stopper (claim 8)

(CSOF ¶ 9.)

---

[15] For simplicity, only claims 4-6 and 8 of the '988 patent are asserted against the Defendants in these consolidated litigations.  Because claims 4-6 are dependent upon claim 1, the elements of claim 1 are addressed here.  Contrary to Defendants' assertion (Sandoz Br. at 6 n. 8), the Federal Circuit has held that district courts do not have jurisdiction to invalidate claims not in controversy.  *Bright Ideas Co. v. Target Corp.*, 2007 U.S. App. LEXIS 12952, at *2 (Fed. Cir. May 14, 2007) (unpublished opinion).

[16] "Hermetically sealed" means sealed in an airtight container.  (CSOF ¶ 53.)  Contrary to Sandoz's assertions, there is no evidence that the solutions of the alleged anticipatory references it cites were ever sealed in *any* container, let alone a hermetically sealed one.  (*See* Sandoz Br. at 28.)  Further, a hypodermic needle and syringe (such as was used in the work reported in the Boughattas reference) is not "hermetically sealed" because it is open to the outside atmosphere on one end.

1.     **The Boughattas Reference**

The Boughattas reference fails to expressly or inherently disclose each of the limitations of claims 4, 5, 6, and 8. (CSOF ¶ 109.) The Boughattas reference discloses experimental testing of oxaliplatin in mice. (CSOF ¶ 131.) Dr. Boughattas's study involved making a simple solution by mixing oxaliplatin "bulk powder" in distilled water, to inject into mice. (CSOF ¶ 125.) He then sacrificed the mice to determine the extent to which oxaliplatin was absorbed by different tissues in the mice. (CSOF ¶ 131.) As confirmed by testimony of Defendants' own witnesses, the Boughattas reference has *nothing* to do with whether oxaliplatin and water provided a commercial stable formulation. (CSOF at ¶¶ 134, 138.)

a.     **Boughattas Fails to Expressly or Inherently Disclose That the Oxaliplatin Formulation Used Was Stable for a Pharmaceutically Acceptable Duration of Time**

Each asserted claim of the '988 patent requires an oxaliplatin and water preparation that is stable for a "pharmaceutically acceptable duration of time."[17] The '988 patent specification states that "a pharmaceutically acceptable duration of time" is a "duration[] generally required in the art" (CSOF ¶ 97), which would be *years* at room temperature or refrigerated.

There is no evidence in the Boughattas reference that the solution used was stable for a pharmaceutically acceptable duration of time. (CSOF ¶¶ 132-133.) Nowhere does the

_____

[17] Defendants proffer no proposed claim construction, and merely assert that claim construction "is undisputed or would have no bearing on the pending motion." (Sandoz Br. at 7). The case law is clear, however, that it is Defendants' burden to prove by clear and convincing evidence that the prior art meets each claim limitation. Although the term "stable for a pharmaceutically acceptable duration of time" is essential to the claimed invention, Defendants avoid addressing the meaning of that term, because they will be compelled to admit that to meet this requirement, a formulation must have pharmaceutically acceptable stability, *i.e.*, stability for years. For purposes of this motion, especially because Defendants have not proffered any claim construction, Plaintiffs' claim construction should be adopted.

Boughattas reference state that the solution used was ever tested for stability at any time, let alone that this solution could remain stable for a pharmaceutically acceptable duration of time (*i.e.,* for years).

Nor would there be any reason to assume that Dr. Boughattas's solution would necessarily remain stable, and there is no evidence that he took ***any*** steps to maintain stability. Indeed, the Boughattas reference suggests that the opposite occurred, stating that the "solution was ***freshly*** prepared on ***each study day*** by adding an adequate volume of distilled water." (CSOF ¶ 122.) (emphasis added).  There would be no reason to prepare a "fresh" solution "each day" if one believed that the oxaliplatin and water solution would remain stable for more than a day.  If Dr. Boughattas actually believed his solutions were commercially stable, he would have simply prepared enough solution to last throughout his 40-day study period—but he did not. (CSOF ¶ 123.)

Moreover, other researchers in the art attempted to make a stable solution of water and oxaliplatin, and failed.  For example, the failed experiments of ████████ and Pharmacia evidence the fact that merely dissolving oxaliplatin in water did not result in a pharmaceutically stable formulation.  (CSOF ¶¶ 66, 70, 76.) ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████  Thus, there is no guarantee that any solution of oxaliplatin in water will always and necessarily remain commercially stable, without following the teachings of the '988 patent. *See W.L. Gore,* 721 F.2d at 1554.

**b.    Boughattas's Formulation May**
**Have Contained Additional Substances**

The '988 claims cover formulations containing oxaliplatin and water, without the addition of significant amounts of other excipients.  (CSOF ¶ 9.)  Nowhere does the Boughattas reference expressly state that there were no other excipients in the oxaliplatin powder he used.  (CSOF ¶¶ 122, 124-129.)  The only information regarding the nature of the oxaliplatin used by Dr. Boughattas was that it was "bulk powder" from Roger Bellon.  (CSOF ¶ 125.)  In fact, it is undisputed that ████████████████████████████████████████████████
████████████████████████████████████████

Plainly, the bulk powder Boughattas used, and thus the resultant solution, could have included a number of other excipients.  (CSOF ¶¶ 125-129.)  On that basis alone, Defendants' motion must fail.

**c.    Boughattas Fails to Disclose the**
**pH of the Oxaliplatin Solution,**

The Boughattas reference does not expressly or inherently disclose the pH of the oxaliplatin solution that was used.  (CSOF ¶¶ 118-119.)  Although pH is a critical parameter that is known to affect stability, the Boughattas reference nowhere discloses the pH of any oxaliplatin solution.  (CSOF ¶¶ 104, 118.)

Moreover, a POSA would not assume that the pH of Boughattas's solutions was inevitably within the claimed 4.5 to 6.0 range.  (CSOF ¶¶ 118-119.)  The pH parameter is affected by several factors, including chemical purity of the oxaliplatin, the quality of the water, the container, and gases that come into contact with the solution.  (CSOF ¶¶ 102-103.)  Boughattas makes no mention of any of these factors.  ████████████████████████
████████████████████████████████████████████████

Because the Boughattas reference does not disclose the composition of the Roger Bellon "bulk

powder" that was used, there is no reason to believe that Boughattas's oxaliplatin and water

solutions necessarily had a pH falling within the claimed range.

> **d.     Boughattas Does Not Disclose the Color,
> Clarity Or Absence of a Precipitate
> From His Oxaliplatin Solution**

Nowhere does the Boughattas reference provide any information as to the color,

clarity or the absence of precipitate of his solution, either immediately after mixing or at any

later time.  (CSOF ¶ 110.)  Because Dr. Boughattas used his solutions for injection into mice, he

had no need for a solution that would meet the regulatory standards of health agencies like the

FDA, or that would meet the standards required for a commercial product.  (CSOF ¶¶ 42, 133.)

One cannot simply assume that his solutions were inevitably clear, colorless, or free of

precipitate; the '988 patent itself teaches that a solution of oxaliplatin should be filtered to

produce a solution that is clear and free of precipitate. (CSOF ¶ 16.)

> **e.     Boughattas Fails to Disclose the Claimed Dosage**

Nowhere does the Boughattas reference disclose, expressly or inherently, that 50

to 100 mg of oxaliplatin was injected into the mice in his experiments as required by Claim 5.

(CSOF ¶ 130.)  Thus, Defendants cannot prove that this claim element is disclosed.

> **f.     Boughattas Fails to Disclose a Vial, a Stopper, or Use of
> an Inert Gas**

Nowhere does the Boughattas reference state that any of the following four '988

claim elements are present: (1) a glass vial, (2) an inert stopper, (3) a hermetically sealed vial, or

(4) a vial with an inert gas.  (CSOF ¶¶ 113-115, 121.)  Given the purpose of his work, and the

fact that his solutions were "freshly prepared on each study day," none of those elements would

have been required for Dr. Boughattas's mouse experiments.  (CSOF ¶¶ 123, 131, 133.)  Because

he would have used the solutions shortly after preparing them, there would have been no need

for Dr. Boughattas to place his oxaliplatin solution in a glass vial with an inert stopper, to hermetically seal whatever container he did use to prepare the solution, to introduce an inert gas into that container, or to take any other steps at all to ensure that the solutions he made would remain stable. (CSOF ¶¶ 111-115, 121-122.) Thus, because none of those measures were necessary for his work, one cannot assume Dr. Boughattas took them.

### 2.   U.S. Patent No. 5,338,874

Like the Boughattas reference, nowhere does the '874 patent expressly or inherently disclose all of the limitations of the asserted claims of the '988 patent. (CSOF ¶¶ 139-150.) Like the '988 patent, the '874 patent is also owned by Plaintiffs, but it is directed to optically pure oxaliplatin. (CSOF ¶ 139.) That is, oxaliplatin that does not contain the undesirable enantiomer.[18] The '874 patent has nothing to do with formulations of oxaliplatin in water that are stable for a commercially acceptable duration, and in fact, the '874 patent does not provide *any* information relating to a commercial, ready to use formulation. (Langer Decl. at ¶¶ 140-141, 150.) Nevertheless, Defendants assert that a solution of oxaliplatin and water that was prepared by the '874 inventors solely for analytical testing, *i.e.*, to test oxaliplatin's optical rotation (*see* SX 2 at Table 3), anticipates the '988 patent claims.

Like the Boughattas reference, nowhere does the '874 patent expressly disclose that this solution prepared for analytical testing: (i) was stable for a pharmaceutically acceptable duration; (ii) contained oxaliplatin and water, without other excipients that affected stability; (iii) had a pH between 4.5 to 6.0; (iv) remained clear and free of precipitate; (v) was dosed between 50 to 100 mg; (vi) was in a glass vial; (vii) closed with an inert stopper; (viii) was hermetically

---

[18] *See* Plaintiffs' Combined Brief in Opposition to Mayne's and Barr's Motions for Summary Judgment of Invalidity filed contemporaneously.

sealed; and (ix) was in container that was filled with an inert gas.  (CSOF ¶¶ 140-141, 145-146, 150.)

   In fact, the oxaliplatin solution disclosed in the '874 patent was made for the very limited purpose of analytical testing, which takes only hours or minutes to complete.  (CSOF ¶ 142.)  As with the Boughattas reference, because the '874 inventors would have used their solution shortly after preparing it, there would have been no need to measure the solution's pH, to place it in a glass vial with an inert stopper, to hermetically seal whatever container they used to prepare the solution, to introduce an inert gas into that container, or to take any other steps at all to ensure the solution would remain stable.  (*See* CSOF ¶¶ 142.)  As with the Boughattas reference, because none of those measures were necessary for the '874 inventors' purposes, one cannot assume such measures were taken.

   Thus, clearly there is no disclosure in the '874 patent, either express or inherent, that would teach one of ordinary skill in the art how to make a pharmaceutically stable solution of oxaliplatin in water as claimed in the '988 patent.  Indeed, one Defendant's expert, ████████ confirmed that the solution and data in table 3 of the '874 patent have nothing to do with the stability of a formulation of oxaliplatin and water.[19]  (CSOF ¶ 153.)

   Defendants also incorrectly assert that the optical rotation value for the oxaliplatin disclosed in the '874 patent somehow predetermines the pH of the solution, and that the solution reported in Table 3 of the '874 patent must have a pH in the range claimed in the '988 patent.  (Sandoz Br. at 26).  Optical rotation, however, does not determine pH or *vice versa* (CSOF ¶ 146.)  These two measurements are entirely unrelated.

---

[19] ████████████████████████████████████████████████████
████████████████████████████████████████

Clearly, then, the elements of the '988 patent claims are not expressly found in the '874 patent. It is also clear that these elements are not inherently disclosed in this prior art reference. Defendants cannot prove that the disclosure of the '874 patent always and necessarily discloses a solution of oxaliplatin in water that is stable for a pharmaceutically acceptable duration of time.

### B.    The Kidani and Mathé References Do Not Disclose Stable Oxaliplatin Solutions, Much Less Solutions That Are Stable for a Pharmaceutically Acceptable Duration of Time

For several '988 patent claims (*e.g.,* claim no. 5), Defendants expressly rely on Boughattas or the '874 patent *plus* at least one other reference, *e.g.,* the Kidani references[20] or Mathé[21] That is plainly impermissible in an anticipation analysis. Defendants must prove that all of the elements of the asserted claims of the '988 patent are found within the four corners of one reference. *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000). Defendants concede that they are not arguing obviousness in the present motion. (Sandoz Br. at 30 n.75). But that is exactly what they are doing for these claims, and for at least that reason, Defendants motions should be denied.

---

[20] The references collectively referred to as "the Kidani references" are

[1] Y. Kidani, *Oxaliplatin,* 14(6) DRUGS OF THE FUTURE 529-532 (1989)("Kidani 1989");

[2] Y. Kidani *et al., Antitumor Activity of 1,2-Diaminocyclohexane-Platinum Complexes Against Sarcoma-180 Ascites Form,* 21(12) J. MED. CHEM. 1315-18 (1978);

[3] Y. Kidani, *Preparative Development of Antitumor 1,2-cyclohexanediamine Platinum Complexes,* 1 TRENDS IN INORGANIC CHEMISTRY 107-125 (1990)("Kidani 1990"); and

[4] Misset *et al., Oxalatoplatinum (l-OHP): Experimental and Clinical Studies in* PLATINUM AND OTHER METAL COORDINATION COMPOUNDS IN CANCER CHEMOTHERAPY (S.B. Howell ed. 1991)("Kidani 1991")(collectively, "the Kidani references").

[21] G. Mathé *et al., A Phase I Trial of Trans-l-Diaminocyclohexane Oxalato-Platinum (l-OHP),* 40 BIOMED. & PHARMACOTHER. 372-376 (1986).

These references fail to anticipate the claims of the '988 patent either expressly or inherently, for all the same reasons provided above as to the Boughattas reference and the '874 patent. (CSOF ¶¶ 154, 161, 163, 172.) (See Attachment A). Indeed, Defendants do not allege that the Kidani or Mathé references anticipate under 35 U.S.C. § 102, and thus concede that issue with respect to those references. Nevertheless, Defendants assert that the Kidani and Mathé references "taught the making of a stable solution of oxaliplatin in water" (Sandoz Br. at 27), which is demonstrably wrong.

### 1.   The Kidani References

The Kidani references report a solution of oxaliplatin in water with a concentration of 7.9 mg/mL. (CSOF ¶ 164.) Thus, the Kidani references do not disclose a solution within the claimed concentration range of the '988 patent (between 1 and 5 mg/mL). (CSOF ¶ 170.) Although one of the Kidani references states that oxaliplatin in water at 7.9 mg/mL is stable for ">1 week" (Kidani 1989), as explained above, a week is far less than a "pharmaceutically acceptable duration of time." (CSOF ¶¶ 97, 165, 168). Moreover, the Kidani statements about stability are not supported by any way experimental data, even for the ">1 week" duration of time that Kidani reports. (CSOF ¶ 165.)[22]

If Dr. Kidani had made an oxaliplatin in water solution that was stable for much longer than one week, surely he would have said so and reported stability as, for example, "greater than one month" or "greater than one year." This is particularly true given the commercial need for such formulations. Moreover, Dr. Kidani cautioned the inventors of the '874 patent that oxaliplatin was *unstable* in water. (CSOF ¶ 173.)

---

[22] To the extent that the Kidani references also state that oxaliplatin in water was stable for a "long period of time" the author was simply referring to the statement discussed in the text that the solution was stable for ">1 week." (CSOF ¶ 166.) In other words, Dr. Kidani was merely equating "long period of time" with a period on the order of one week.

### 2.     The Mathé Reference

The Mathé reference simply states that the oxaliplatin used was in a vial, without any reference as to whether it was in solution or not.  (CSOF ¶¶ 156-157.)  Nowhere does the Mathé reference disclose any indication of stability at any time.  (CSOF ¶¶ 155, 159.)  The Mathé reference does not disclose the use of a stopper, a hermetically sealed container, a pH of 4.5 to 6, an inert gas in the headspace, whether the solution was (or would be) clear, colorless, and free of precipitate for a pharmaceutically acceptable duration of time, or even whether the oxaliplatin is in solution.  (CSOF ¶ 155.)

There is no indication of the pH (of either the material in the vials or any solution that might be made from that material), and no disclosure of the stability of the oxaliplatin preparations.  (CSOF ¶¶ 155, 158)  The Mathé reference only indicates that "L-OHP was kindly supplied by R. Bellon Laboratory as a formulation in 1 ml vials containing 1 mg[,] 10 ml vials containing 10 mg[,] and 100 ml vials containing 100 mg" of oxaliplatin.  (CSOF ¶ 156.)

### III.    Sandoz's Request That the Court Adopt the Decisions of Foreign Tribunals Is Inappropriate

Finally, Defendants urge the Court to look to invalidity decisions rendered by Korean and Chinese courts concerning the Korean and Chinese counterparts of the '988 patent. These foreign decisions, however, are not evidence and have "no binding effect in U.S. patent litigation." *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907-08 (Fed. Cir. 1986); *see also Matsushita Elec. Indus. Co. v. Samsung Elecs. Co.*, 2006 U.S. Dist. LEXIS 42934, at *26 n10 (D.N.J. June 26, 2006); *Marion Merrell Dow v. American Cyanamid Co.*, 1994 U.S. Dist. LEXIS 11495, at *19 (D.N.J. Aug. 12, 1994).  In fact, as the Federal Circuit noted in *Medtronic*, use of foreign case law for the purposes Defendants advance is "specious" because U.S. courts apply

the patent laws of the United States, not the laws of other countries. *See Medtronic,* 789 F.2d

903 at 907-08 (Fed. Cir. 1986).

      Moreover, Defendants' request that this Court adopt the decision of the Chinese

court is surprising because that court upheld the validity of seven of the nine claims, including all

of the claims having the same limitations as the '988 claims asserted against Defendants here.

## CONCLUSION

      Clearly, for both invalidity defenses raised by these motions, Defendants have

failed to show clear and convincing evidence of undisputed facts warranting judgment in their

favor as a matter of law.  Defendants' motions should be denied in all respects.

Dated:  December 23, 2008        Respectfully submitted,


        By:  /s/ William J. O'Shaughnessy

        William J. O'Shaughnessy, Esq.
        Jonathan M.H. Short, Esq.
        McCARTER & ENGLISH, LLP
        Four Gateway Center
        100 Mulberry Street
        Newark, New Jersey 07102
        (973) 622-4444

        Of Counsel:
        Dominick A. Conde, Esq.
        William E. Solander, Esq.
        Colleen Tracy, Esq.
        Peter D. Shapiro, Esq.
        FITZPATRICK, CELLA, HARPER & SCINTO
        30 Rockefeller Plaza
        New York, NY 10112-3801
        Phone: (212) 218-2100
        Facsimile: (212) 218-2200

        Attorneys for Plaintiffs,
        SANOFI-AVENTIS, SANOFI-AVENTIS U.S. LLC,
        And DEBIOPHARM S.A.

Attachment A

| CLAIM | Boughattas | '874 Patent | Mathé | Kidani |
|---|---|---|---|---|
| **_Claim 1_** | | | | |
| a solution | ✓ | ✓ | | ✓ |
| of oxaliplatinum [with no additional excipients having a significant effect on stability] | | ✓ | | ✓ |
| in water | ✓ | ✓ | | ✓ |
| at a concentration of 1 to 5 mg/ml | ✓ | ✓ | | |
| and having a pH of 4.5 to 6, | | | | |
| the oxaliplatinum content in the preparation being at least 95% of the initial content (after storage for a pharmaceutically acceptable duration of time) | | | | |
| and the solution remaining clear (after storage for a pharmaceutically acceptable duration of time), | | | | |
| colorless (after storage for a pharmaceutically acceptable duration of time) | | | | |
| and free of precipitate (after storage for a pharmaceutically acceptable duration of time) | | | | |
| after storage | | | | |
| for a pharmaceutically acceptable duration of time | | | | |

| CLAIM | Boughattas | '874 Patent | Mathé | Kidani |
|---|---|---|---|---|
| **Claim 4** *(Claim 1 + the following)*[23] | | | | |
| (a preparation)in the form of an aqueous solution of oxaliplatinum | ✓ | ✓ | | ✓ |
| ready to be used | | | | |
| and contained in a hermetically sealed container | | | | |
| **Claim 5** *(Claim 4 + the following)* | | | | |
| said container contains an active unit dose of 50 to 100 mg of oxaliplatinum, | | | ✓ | |
| which can be administered by infusion | ✓ | | ✓ | |
| **Claim 6** *(Claim 4 + the following)* | | | | |
| said container is a glass vial | | | ✓ | |
| for pharmaceutical use | | | ✓ | |
| and is closed with a stopper | | | | |
| of which, at least, the surface extending inside the vial is inert with respect to said solution | | | | |
| **Claim 8** | | | | |
| a glass vial | | | ✓ | |
| closed with a stopper | | | | |
| vial containing | | | | |
| a solution | ✓ | ✓ | | ✓ |

[23] Analysis of dependant claims assumes that the limitations of the claims from which they depend have been met. Even with that assumption, the limitations of the dependant claims are not met by any of the references.

| CLAIM | Boughattas | '874 Patent | Mathé | Kidani |
|---|---|---|---|---|
| of oxaliplatinum [with no significant additional excipients] | | ✓ | | ✓ |
| in water | ✓ | ✓ | | ✓ |
| at a concentration of 1 to 5 mg/ml | ✓ | ✓ | | |
| and having a pH of 4.5 to 6, | | | | |
| the oxaliplatinum content in the preparation being at least 95% of the initial content (after storage for a pharmaceutically acceptable duration of time) | | | | |
| and the solution remaining clear (after storage for a pharmaceutically acceptable duration of time), | | | | |
| colorless (after storage for a pharmaceutically acceptable duration of time) | | | | |
| and free of precipitate (after storage for a pharmaceutically acceptable duration of time) | | | | |
| after storage | | | | |
| for a pharmaceutically acceptable duration of time | | | | |
| wherein said stopper has an inner surface which is inert with respect to said solution | | | | |
| said vial further comprising inert gas filling a space between said solution and said stopper | | | | |