UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANOFI-AVENTIS U.S. LLC,<br>SANOFI-AVENTIS,<br>DEBIOPHARM, S.A.<br><br>Plaintiffs,<br><br>v.<br><br>TEVA PARENTERAL MEDICINES, INC.,<br>TEVA PHARMACEUTICALS USA, INC.,<br>PHARMACHEMIE B.V.,<br>BARR LABORATORIES, INC.,<br>PLIVA-LACHEMA A.S.<br><br>Defendants. | **CIVIL ACTION NO. 3:07-cv-02762-JAP**<br>**(Consolidated case nos. 3:07-cv-02837,**<br>**-3144, -5408 and 3:08-cv-0079)**<br><br>**MOTION DATE:  November 17, 2009**<br><br><br>**REDACTED VERSION** |

**TEVA'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Allyn Z. Lite, Esq.
Michael E. Patunas, Esq.
Mayra V. Tarantino, Esq.
**LITE DEPALMA**
**GREENBERG & RIVAS, LLC**
Two Gateway Center, 12th Floor
Newark, NJ  07102
Tel:  (973) 623-3000
E-Mail: alite@ldgrlaw.com
        mpatunas@ldgrlaw.com
        mtarantino@ldgrlaw.com

*Attorneys for Defendants*
*TEVA PARENTERAL MEDICINES, INC.,*
*TEVA PHARMACEUTICALS USA, INC.,*
*PHARMACHEMIE B.V.,*
*BARR LABORATORIES, INC., AND*
*PLIVA-LACHEMA A.S.*

David M. Hashmall, Esq.
Frederick H. Rein, Esq.
Keith A. Zullow, Esq.
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333
E-Mail: dhashmall@goodwinprocter.com
        frein@goodwinprocter.com
        kzullow@goodwinprocter.com

Emily L. Rapalino, Esq.
**GOODWIN PROCTER LLP**
Exchange Place
Boston, MA 02109
Tel.: (617) 570-1000
Fax:  (617) 523-1231
E-Mail:  erapalino@goodwinprocter.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

SUMMARY OF ARGUMENT ....................................................................... 1

BACKGROUND ............................................................................................ 3

I.     TECHNICAL BACKGROUND ......................................................... 3

II.    PROCEDURAL BACKGROUND ...................................................... 4

ARGUMENT ................................................................................................. 6

I.     PLAINTIFFS CANNOT MEET THE HEAVY BURDEN OF SHOWING THAT
       A PRELIMINARY INJUNCTION IS WARRANTED ....................................... 6

       A.     Plaintiffs Have Not Shown A Likelihood Of Success On The Merits .................. 7

              1.     Claim 1 Of The '874 Patent Is Indefinite .................................................. 7

                     a.     The Law Of Indefiniteness ............................................................ 8

                     b.     The '874 Patent And Its Prosecution History Do
                            Not Support Any Claim Construction, Rendering
                            Claim 1 Indefinite ........................................................................ 8

                     c.     Plaintiffs' Construction Of "Optically Pure"
                            ($\geq$ 99.95%) Is Incorrect ............................................................ 10

                            (i)     The '874 Patent Does Not Incorporate By
                                    Reference The '642 Patent ................................................ 10

                            (ii)    No LOD Is Incorporated By Reference ........................... 11

                     d.     The Other Alleged Constructions Of "Optically
                            Pure" ($\geq$ 99.97% And $\geq$ 99.991%) Are Incorrect ........................ 12

              2.     A Substantial Question Of Claim Construction Exists,
                     Providing An Independent Basis For Denying Plaintiffs'
                     Motion .......................................................................................................... 13

              3.     Under Any Construction Of "Optically Pure," Claim 1 Is
                     Obvious In View Of The Kidani '846 Patent ........................................... 14

a.    The Kidani '846 Patent Provides Motivation To Purify Oxaliplatin And A Reasonable Expectation That Purified Oxaliplatin Would Possess Beneficial Properties ............................................................. 14

b.    Plaintiffs' Allegations Regarding "Unpredictability" In Achieving Successful Purification Are Unsupported And Legally Irrelevant ............................................. 18

c.    Plaintiffs' Arguments Based On Secondary Considerations Of Non-Obviousness Are Meritless And Unsupported .................................................................... 21

B.    Plaintiffs Will Not Suffer Irreparable Harm ........................................................ 23

1.    This Court Has Already Found That Plaintiffs Will Not Be Irreparably Harmed By Sales Of Teva's Generic Oxaliplatin Product ................................................................ 23

2.    Sanofi's Irreparable Harm Predictions Were Exaggerated And Remain Far Too Speculative To Support Grant Of A Preliminary Injunction ........................................................ 24

3.    Debiopharm's Irreparable Harm Predictions Were Exaggerated And Are Too Speculative To Support Grant Of A Preliminary Injunction .................................................. 26

C.    The Harm To Teva, Like The Harm To Plaintiffs, Is Reparable – But Only If Plaintiffs Post An Appropriate Bond ..................................................... 27

D.    The Grant Of A Preliminary Injunction Will Irreparably Harm The Public ........ 27

II.   THE EXTREME REMEDY OF RECALL IS NOT WARRANTED .............................. 28

A.    Plaintiffs Cannot Satisfy The Requirements For A Preliminary Injunction; Therefore, No Recall Is Warranted ....................................................... 28

B.    Reparable Economic Harm To Plaintiffs Does Not Outweigh The Irreparable Harm A Recall Would Cause Teva And The Public ............................................. 29

C.    Teva's Transparent Actions Taken In Good Faith Do Not Support A Recall ...... 30

CONCLUSION ................................................................................................. 32

# TABLE OF AUTHORITIES

## CASES

*In re Adamson*,
   275 F.2d 952 (C.C.P.A. 1960) ...................................................................... 14-15

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   212 F.3d 1272 (Fed. Cir. 2000)..........................................................................10

*Alloc, Inc. v. ITC*,
   342 F.3d 1361 (Fed. Cir. 2003)..........................................................................12

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
   532 F. Supp. 2d 666 (D.N.J. 2007), *aff'd*, 566 F.3d 999 (Fed. Cir. 2009)...............................7

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
   566 F.3d 999 (Fed. Cir. 2009)..............................................................................6

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)............................................................................6

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991)...................................................................... 8-10

*Application of Fouche*,
   439 F.2d 1237 (C.C.P.A. 1971) ..........................................................................10

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
   499 F.3d 1293 (Fed. Cir. 2007)............................................................14-16, 19-21

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP*,
   528 F.3d 176 (3d Cir. 2008).............................................................................28

*Brewer v. Quaker State Oil Refining Corp.*,
   72 F.3d 326 (3d Cir. 1995)..............................................................................23

*Callaway Golf Co. v. Acushnet Co.*,
   576 F.3d 1331 (Fed. Cir. 2009)..........................................................................10

*Cordis Corp. v. Medtronic Ave, Inc.*,
   No. 97-550, 2005 U.S. Dist. LEXIS 2260 (D. Del. Jan. 27, 2005) ..........................................7

*Cybermedia, Inc. v. Symantec Corp.*,
   19 F. Supp. 2d 1070 (N.D. Cal. 1998) ...................................................................29

*eBay, Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).......................................................................................29

*Eli Lilly & Co. v. Am. Cyanamid Co.*,
   82 F.3d 1568 (Fed. Cir. 1996)...................................................................................7

*Emory Univ. v. Glaxo Wellcome Inc.*,
   44 U.S.P.Q.2d 1407 (N.D. Ga. 1997) ...................................................................14

*Ex parte Gray*,
   10 U.S.P.Q.2d 1922 (B.P.A.I. 1989)................................................................ 14-16

*Gucci Am., Inc. v. Daffy's, Inc.*,
   354 F.3d 228 (3d Cir. 2003)..................................................................................28

*Halliburton Energy Svcs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008).......................................................................... 8-9

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
   49 F.3d 1551 (Fed. Cir. 1995)..............................................................................23

*Honeywell Int'l, Inc. v. ITC*,
   341 F.3d 1332 (Fed. Cir. 2003)..............................................................................8

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
   906 F.2d 679 (Fed. Cir. 1990)..............................................................................29

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
   995 F.2d 1566 (Fed. Cir. 1993)..............................................................................6

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
   392 F.3d 1317 (Fed. Cir. 2004)...................................................................... 21-22

*J & J Snack Foods, Corp. v. Nestle USA, Inc.*,
   149 F. Supp. 2d 136 (D.N.J. 2001) ................................................................ 29-30

*Kraft Gen. Foods Inc. v. Friendship Dairies Inc.*,
   No. 91-2276, 1991 U.S. Dist. LEXIS 18213 (S.D.N.Y. June 27, 1991) ...............31

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)..............................................................................................15

*In re May*,
   574 F.2d 1082 (C.C.P.A. 1978) ...........................................................................15

*NBA Props. v. Untertainment Records LLC*,
   No. 99-2933, 1999 U.S. Dist. LEXIS 7780 (S.D.N.Y. May 26, 1999) ..................30

*Novo Nordisk A/S v. Sanofi-Aventis U.S. LLC*,
   290 F. App'x 334 (Fed. Cir. 2008) (unpublished opinion)....................................13

*Novo Nordisk, Inc. v. Eli Lilly*,
    No. 96-5787, 1996 U.S. Dist. LEXIS 12807 (S.D.N.Y. Aug. 30, 1996)........................ 28-30

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) (en banc) ............................................................28

*Ortho McNeil Pharm., Inc. v. Barr Labs., Inc.*,
    No. 03-4678, 2009 U.S. Dist. LEXIS 62721 (D.N.J. July 22, 2009)......................31

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    348 F. Supp. 2d 713 (N.D. W. Va. 2004), *aff'd*, 161 F. App'x 944 (Fed. Cir. 2005) .............16

*PAF S.r.l. v. Lisa Lighting Co.*,
    712 F. Supp. 394 (S.D.N.Y. 1989)........................................................................30

*Perfect Fit Indus. v. Acme Quilting Co.*,
    646 F.2d 800 (2d Cir. 1981)..................................................................................30

*PharmaStem v. Via Cell*,
    491 F.3d 1342 (Fed. Cir. 2007)............................................................................21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................13

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).................................................................................................24

*Rohm & Haas Co. v. Cumberland Chem. Corp.*,
    No. 82-1241, 1983 U.S. Dist. LEXIS 19879 (S.D. Tex. Jan. 21, 1983).................31

*Shuffle Master, Inc. v. MP Games LLC*,
    553 F. Supp. 2d 1202 (D. Nev. 2008)...................................................................22

*Ex parte Stern*,
    13 U.S.P.Q.2d 1379 (B.P.A.I. 1987).....................................................................14

*TI Group Auto. Sys. v. VDO N. Am., L.L.C.*,
    375 F. 3d 1126 (Fed. Cir. 2004).............................................................................7

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)...............................................................................6

*United States v. Spectro Foods Corp.*,
    544 F.2d 1175 (3d Cir. 1976)............................................................................28-29

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008)..........................................................................................6-7

*Zenon Envtl., Inc. v. U.S. Filter Corp.*,
    506 F.3d 1370 (Fed. Cir. 2007)...............................................................................11


**STATUTES**

21 U.S.C. § 355(j)(5)(B)(iii)(I)(a)...................................................................................4


**OTHER AUTHORITIES**

Fed. R. App. P. 8(a)(1)(A) ...............................................................................................4

Fed. R. App. P. 8(a)(1)(C) ...............................................................................................4

## SUMMARY OF ARGUMENT

Teva Parenteral Medicines, Inc., Teva Pharmaceuticals USA, Inc., Pharmachemie B.V., Barr Laboratories, Inc., and Pliva-Lachema a.s. (collectively "Teva") submit this memorandum in opposition to the motion of Sanofi-Aventis U.S. LLC, Sanofi-Aventis, and Debiopharm S.A. (collectively "plaintiffs") for a preliminary injunction.  Plaintiffs seek an order that would not only block continued access by patients and doctors to Teva's lower cost oxaliplatin solution product, but also require the recall of product that was first sold only after (i) this Court entered final judgment of non-infringement, (ii) Teva provided advance notice to plaintiffs of its intent to launch, and (iii) plaintiffs failed to seek an injunction pending appeal.  Plaintiffs' motion should be denied because plaintiffs have not established likelihood of success and the balance of harms fails to support injunctive relief.

Teva need only raise a substantial defense, such as invalidity, to defeat this motion.  To assess invalidity, the Court must address the proper construction, if any, of the term "optically pure" in claim 1 of U.S. Patent No. 5,338,874 ("the '874 patent"), the only claim asserted in plaintiffs' motion.  The construction proposed by plaintiffs and the constructions they attribute to other defendants are inconsistent with the '874 patent and its prosecution history.  Indeed, the intrinsic and extrinsic evidence do not support *any* claim construction.  Thus, claim 1 is invalid because it is indefinite.  At minimum, there is substantial uncertainty as to the proper construction of the claim term "optically pure," and whether that term is even amenable to construction.  Therefore, plaintiffs' cannot establish that Teva's indefiniteness defense lacks substantial merit.

Even if the Court adopts plaintiffs' construction (or any other construction), claim 1 of the '874 patent is invalid because it is obvious in view of long-expired U.S. Patent No. 4,169,846 ("the Kidani '846 patent").  The Kidani '846 patent renders claim 1 *prima facie* obvious because

it teaches the benefits of oxaliplatin and how to make "optically pure" oxaliplatin (as confirmed by successful repetitions of the process disclosed in the Kidani '846 patent.)  Plaintiffs fail to rebut this *prima facie* obviousness with unexpected results.  And plaintiffs' supposed evidence of other secondary considerations is perfunctory and unsupported.  At a minimum Teva has raised an obviousness defense that plaintiffs have not shown to be insubstantial.  For this additional reason, plaintiffs cannot establish likelihood of success on the merits.

The balance of harms also weighs in favor of Teva.  As this Court previously found, plaintiffs' alleged harms are not irreparable.  They are speculative at best and compensable by money damages.  The public, however, faces irreparable harm because an injunction would unjustifiably force the public to pay unwarranted monopoly prices for oxaliplatin, with no recourse if Teva ultimately prevails.  Furthermore, plaintiffs' delay in seeking a preliminary injunction and their decision to license the '874 patent are inconsistent with their allegations of irreparable harm.  For all of these reasons, plaintiffs' motion for a preliminary injunction should be denied.

Having failed to demonstrate the propriety of a preliminary injunction, plaintiffs certainly cannot satisfy the far more stringent standard required to justify a recall of generic products already sold.  Teva gave plaintiffs advance notice of its intent to launch.  And Teva did not launch until the Federal Circuit (as well as the D.C. District Court in a related action) had denied plaintiffs' several attempts to block such a launch.  Teva's conduct in no way justifies the draconian remedy of a recall, which would cause irreparable harm to Teva and the public.

Significantly, in none of plaintiffs' repeated efforts to obtain an order blocking the launch of Teva's generic product pending appeal, did plaintiffs attempt to establish that they were likely to succeed on the merits.  Had plaintiffs established the predicate for an injunction then, as they

try to do now, recall would not be an issue.  Plaintiffs' three-month delay in seeking a

preliminary injunction eliminates any equitable basis for a recall order.

## BACKGROUND

## I.    TECHNICAL BACKGROUND

This case involves an enantiomer,[1] oxaliplatin (also called *l*-OHP).  Oxaliplatin is a

decades old compound long recognized as having cancer fighting activity.  The Kidani '846

patent, which issued in 1979, disclosed the desirable activity and lower toxicity of oxaliplatin

compared to its mirror image isomer (*d*-OHP) and contained a single claim to the oxaliplatin

enantiomer with no further limitations.  Patunas Ex. 1, '846 Patent, Tables 1, 2, 16:18-19.

The Kidani '846 patent also taught a conventional method for obtaining optically purified

oxaliplatin.[2]  This method separated the enantiomers of a starting material known as "DACH,"

which is a mixture of *l*- and *d*-DACH enantiomers, to obtain pure *l*-DACH, and then used the

resulting pure *l*-DACH to make *l*-OHP (oxaliplatin).[3]  Patunas Ex. 1, '846 patent, 3:33, 14:53-

15:20.  The method taught by Kidani separated the DACH enantiomers by fractional

crystallization.  In that process, DACH is reacted with a specific "resolving agent," tartaric acid,

which binds to the two DACH enantiomers, creating DACH-tartrate salt complexes with

different solubilities, making their separation and isolation possible.  Patunas Ex. 2, Feb. 2009

Fahrni Decl. ¶¶ 14-16; Armstrong Decl., Ex. A ¶¶ 24-27, 58-61.

---

[1]    Enantiomers are molecules that are non-superimposable mirror images of each other, like a right and left hand.  D378, June 18 Dist. Ct. Op. 3.  Citations to previous filings in this Court are indicated by reference to docket entries, *i.e.*, D__.

[2]    Repetition of the conventional oxaliplatin purification method taught by the Kidani '846 patent yielded > 99.98% pure oxaliplatin by weight.  *See* Patunas Ex. 2, Feb. 2009 Fahrni Decl. ¶¶ 5-8, Ex. 2; Patunas Ex. 3, Second Supp. Fahrni Rpt. at 2 and attached notebook pages; *see* Patunas Ex. 4, Feb. 5, 2009 Richter Decl. ¶¶ 9-10.

[3]    It is undisputed that the optical purity of the *l*-DACH dictates the optical purity of oxaliplatin.  Lippard Ex. A ¶ 44; D232-3, Oct. 2008 Davies Rpt. ¶ 59.

Other prior art references from the late 1970s and 1980s also disclosed the synthesis of *l*-OHP from optically purified *l*-DACH using the Kidani process.  *See* Patunas Ex. 5, Speer; Patunas Ex. 6, Vollano.  Moreover, prior to filing the '874 patent, **REDACTED**

[4] Patunas Ex. 7, Y. Ohnishi Tr. 522:8-17; D232-3, Oct. 2008 Davies Rpt. ¶ 71, second bullet; Patunas Ex. 8, Original Tanaka DMF TKK04993-96, TKK05020-21.

## II.      PROCEDURAL BACKGROUND

On June 30, 2009, this Court entered final judgment of non-infringement on behalf of defendants.  Pursuant to the Federal Food Drug and Cosmetic Act, entry of this Court's final judgment ended the thirty month stay and required FDA approval of defendants' generic products (to the extent otherwise approvable).  *See* 21 U.S.C. § 355(j)(5)(B)(iii)(I)(a).  Plaintiffs could have immediately sought a preliminary injunction or an *injunction pending appeal* under Fed. R. App. P. 8(a)(1)(C) to prevent Teva from launching after this Court's entry of final judgment.  Plaintiffs sought neither, attempting instead to forestall final FDA approval of Teva's generic drug application.  Plaintiffs asked the Federal Circuit to issue (1) a writ of mandamus directing this Court to vacate its judgment of non-infringement (which was denied) and (2) a *stay pending appeal* under Fed. R. App. P. 8(a)(1)(A) (which was granted, without explanation, by a divided panel on July 10), all the while acknowledging that a stay pending appeal might not prevent FDA approval (and therefore launch) of defendants' oxaliplatin products.  *See* Patunas

─────────────────────

[4]      "Optical purity" can be expressed as the difference between the percentages of the desired and undesired enantiomers, called "enantiomeric excess" or "e.e."  While the intrinsic evidence refers to e.e., plaintiffs' proposed construction is in weight percent (*i.e.* "% by weight").  This brief will use weight percent, with the e.e. conversion in parentheses, if needed for clarity.  For example, 99.5% by weight (99.0% e.e.).

Ex. 9, July 1 Pl. Mandamus Pet. 3, n.2.  During Federal Circuit briefing, Teva and Mayne noted

that in seeking a stay pending appeal, plaintiffs neither sought an injunction pending appeal nor

addressed the legal requirements for an injunction.  *See* Patunas Ex. 10, July 16 Teva Mot. for

Clarification 8-12; *see also* Patunas Ex. 11, July 7 Teva Response to Stay Mot. 7; *see* Patunas

Ex. 12, July 7 Mayne Opp. to Stay Mot. 2.  Plaintiffs never remedied this deficiency.

On August 7, FDA granted final approval to Teva's oxaliplatin product.  Patunas Ex. 13,

Aug. 7 Teva NDA 22-160 Approval Letter.  The next day, Teva notified plaintiffs of this

approval but indicated that Teva would not launch its product until August 11, providing

plaintiffs further opportunity to seek an injunction against the launch pending appeal.  Patunas

Ex. 14, Aug. 8 E-mail to Pl. Counsel.  Plaintiffs never sought such an injunction against Teva,

seeking instead an order requiring FDA to rescind its approvals.  Patunas Ex. 15, Aug. 10 D.C.

Dist. Ct. Complaint at 13.  This motion was denied the same day it was filed.  Patunas Ex. 16,

Aug. 10 D.C. Dist. Ct. Tr. 19.

Concurrently, plaintiffs filed a motion with the Federal Circuit ostensibly to enforce the

stay pending appeal (Patunas Ex. 17, Aug. 10 Pl. Mot. to Enforce Stay), and even requested a

recall (Patunas Ex. 18, Aug. 11 Letter to Fed. Cir.).  The Federal Circuit denied plaintiffs'

motion to enforce the stay, finding that plaintiffs failed to address the legal requirements for an

injunction.[5]  Patunas Ex. 20, Aug. 11 Fed. Cir. Order 3.  Only after this denial did Teva launch

its oxaliplatin product.

---

[5]     On panel reconsideration of this decision, Judge Moore, in a concurrence, stated:  "[The panel's] inability to rectify the problem is due to Sanofi's failure to file for a preliminary injunction against the generics seeking to prevent them from entering the market."  Patunas Ex. 19, Aug. 13 Fed. Cir. Order 5.

## ARGUMENT

## I.   PLAINTIFFS CANNOT MEET THE HEAVY BURDEN OF SHOWING THAT A PRELIMINARY INJUNCTION IS WARRANTED

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  Plaintiffs must show:  (i) a reasonable likelihood of success on the merits of the case; (ii) irreparable harm in the absence of a preliminary injunction; (iii) a balance of hardships in favor of plaintiffs; and (iv) that the preliminary injunction favors the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

Plaintiffs misstate the standard for succeeding on their showing of likelihood of success.  Contrary to plaintiffs' suggestion:

> the alleged infringer at the preliminary injunction stage does not need to prove invalidity by the "clear and convincing" standard that will be imposed at trial on the merits. … We reiterate that the "clear and convincing standard regarding the challenger's evidence applies only at trial on the merits, not at the preliminary injunction stage.

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379-80 (Fed. Cir. 2009); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001) ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.").  If defendants raise a "substantial question" of patent invalidity, plaintiffs must respond with contrary evidence establishing that each invalidity defense lacks substantial merit.  *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009).  Where, as here, the movant fails to present evidence refuting the "substantial questions" raised, "it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue."  *Titan Tire*, 566 F.3d at 1379.

Moreover, as a matter of law, harms compensable by money damages are not irreparable. *See, e.g., Altana Pharma AG v. Teva Pharms. USA, Inc.*, 532 F. Supp. 2d 666, 683 (D.N.J. 2007), *aff'd*, 566 F.3d 999 (Fed. Cir. 2009). Such compensable, "reparable" harms include the loss of research and other business opportunities, to which the revenues lost to competition might have been devoted. *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996).

Finally, even if a patentee successfully demonstrates both likelihood of success and irreparable harm, a preliminary injunction may not issue absent a showing that the balance of hardships weighs in its favor and the public interest favors the injunction. *See Winter*, 129 S. Ct. at 376-78.

**A.     Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

Defendants have at least two independent invalidity defenses,[6] each of which has substantial merit:  indefiniteness,[7] and in the alternative, obviousness.

**1.     Claim 1 Of The '874 Patent Is Indefinite**

While the Federal Circuit rejected this Court's construction of the term "optically pure," it did not address what the correct claim construction might be or whether that term is even amenable to an alternative construction. The Federal Circuit, which reviews claim construction

---

[6]   To defeat plaintiffs' motion, Teva need only establish that it has at least one defense raising a "substantial question." Thus, there is no need for Teva to address herein all of the substantial defenses that it may raise at trial.

[7]   Plaintiffs were aware of indefiniteness, as it was raised in Barr's June 6, 2008 Response to Interrogatory No. 7. Moreover, indefiniteness, which became relevant after the Federal Circuit vacated summary judgment based on this Court's previous claim construction, was not waived. *See, e.g., TI Group Auto. Sys. v. VDO N. Am., L.L.C.*, 375 F. 3d 1126, 1139-40 (Fed. Cir. 2004) (invalidity considerations changed as a result of the revised claim construction and will be considered on remand); *Cordis Corp. v. Medtronic Ave, Inc.*, No. 97-550, 2005 U.S. Dist. LEXIS 2260, at *5 (D. Del. Jan. 27, 2005) (denying plaintiffs' motion for summary judgment that defendants have waived invalidity argument on remand; issue had changed as a result of revised claim construction).

*de novo*, did not adopt plaintiffs' ≥ 99.95% construction advocated at the Federal Circuit, and again advocated here.  *See* Patunas Ex. 21, Aug. 28 Pl. Fed. Cir. Merits Reply Br. 5.  That is because, as explained below, plaintiffs' construction lacks record support.  There is no plausible alternative construction.  Therefore, claim 1 of the '874 patent is indefinite.

**a.      The Law Of Indefiniteness**

A claim is indefinite if the scope of the claim language is "insolubly ambiguous" or does not permit a competitor to determine whether its product infringes the claim.  *Halliburton Energy Svcs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008); *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003).  A claim is "insolubly ambiguous" when "the claims, the written description, and the prosecution history fail to give … the interpreter of the claim term, any guidance as to what one of ordinary skill in the art would interpret the claim to require."  *Honeywell Int'l, Inc.,* 341 F.3d at 1340.  The definiteness requirement has special force where, as here, there is close prior art, *i.e.*, the Kidani '846 patent:  "When the meaning of claims is in doubt, especially when, as is the case here, there is close prior art, they are properly declared invalid."  *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991).

**b.      The '874 Patent And Its Prosecution History Do Not Support
Any Claim Construction, Rendering Claim 1 Indefinite**

The claim term "optically pure" is not amenable to construction.  The claims, specification, and prosecution history of the '874 patent provide no explicit numerical limit for the amount of impurity that prevents a sample from being "optically pure."  The intrinsic evidence only excludes ≤ 95% by weight (90% e.e.) oxaliplatin:  "90% [e.e. oxaliplatin is] not optically pure."  D191-3, Dec. 21, 1993 Response to Office Action, ELOX0133-36 at ELOX0135.  Plaintiffs acknowledge as much.  D194, Plaintiffs' Opp. to Def. Mot. for Summary Judgment of Non-Infringement 11 ("Here, the patentee only clearly distinguished the '874

invention from the prior art that disclosed oxaliplatin having an optical purity of 95% by weight [90.0% e.e.].").

The specification and the remainder of the prosecution history provide no practical guidance for claim construction. The Abstract states that the "complete optical purity of the above compound [oxaliplatin] may be proved by comparing the respective melting points of the [oxaliplatin]." Patunas Decl. Ex. 22, '874 patent, Abstract. During prosecution, applicants stated that "[o]ptical purity of a compound can only be determined by means of its specific optical rotation, its circular dichroism, and the like." D191-3, ELOX0135. Yet, plaintiffs' expert, Dr. Davies, testified that none of these methods can distinguish between oxaliplatin that would infringe claim 1 under any of the constructions addressed in plaintiffs' motion (*see* Sections II.A.1.c. and d. below) and oxaliplatin that would not infringe under such constructions. *See* Patunas Ex. 23, Dec. 2008 Davies Tr. 299:2-24; Patunas Ex. 24, Oct. 2009 Davies Tr. 625:5-20; D232-3, Oct. 2008 Davies Rpt. ¶ 124.

Similarly, the extrinsic evidence provides no guidance as to how to construe the term "optically pure." The extrinsic evidence demonstrates only that the term "optically pure" was used by different people in the art to mean different things. Wolf Decl. ¶¶ 6-9. Indeed, articles published even years after the patent application was filed comment upon the uncertainty surrounding this term. Wolf Decl. ¶ 6.

With no clear numerical limit supported by the '874 patent, its prosecution history, or the extrinsic evidence, the claim to "optically pure" oxaliplatin is insolubly ambiguous. *Halliburton Energy Svcs., Inc.*, 514 F.3d at 1253 ("fragile gels" found indefinite where patent failed to "identify the degree of the fragility of its invention"); *Amgen,* 927 F.2d at 1217-18 ("at least

about" indefinite because patent provided no guidance as to where to draw the line between prior art numerical value and the close numerical value in the patent).

**c.     Plaintiffs' Construction Of "Optically Pure" (≥ 99.95%) Is Incorrect**

Plaintiffs argue that "optically pure" means oxaliplatin having "an optical purity of 99.95% by weight or higher oxaliplatin (0.05% or less of the undesired *d*-OHP enantiomer.)"  Pl. Br. 5.  However, this value appears nowhere in the claims, specification, or prosecution history of the '874 patent.  Recognizing this deficiency, plaintiffs argue that this limit should be read into the claim because (1) the '874 patent incorporates by reference another patent, U.S. Patent No. 5,298,642 ("the '642 patent"; D176-3), (2) the '642 patent indicates that 0.05% is the limit of detection ("LOD") for the HPLC method described in the '874 patent, and (3) the claim to "optically pure" should be read to mean oxaliplatin with levels of *d*-OHP at or below the LOD for that method.  *Id.* 5-7.  Plaintiffs' arguments fail.

**(i)     The '874 Patent Does Not Incorporate By Reference The '642 Patent**

The '874 patent does not meet the legal requirements for incorporating the '642 patent by reference.  To incorporate material from a co-pending application by reference, the host patent must identify with particularity the specific material incorporated and clearly indicate where that material is found in the co-pending application.  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *Application of Fouche*, 439 F.2d 1237, 1239 (C.C.P.A. 1971).  A bald reference — as in the '874 patent — to another application, without more, is insufficient as a matter of law.  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009).

Plaintiffs point to the following passage in the '874 patent in support of incorporation:

> The cis-oxalato (trans-1-1,2-cyclohexanediamine) Pt(II) of optically high purity of the present invention *may be prepared* by completely and optically resolving the Pt(II) optical isomers *by means of a process* of optically resolving an optically active platinum complex compound disclose [sic] in an application of the same Applicant of the same date.

Patunas Ex. 22, '874 patent, 2:14-21 (emphasis added). This passage fails to meet the incorporation requirements because it fails to particularly identify specific material from the '642 patent and where that material is found. Indeed, plaintiffs' expert, Dr. Fanfarillo, admitted it is "unclear" and "ambiguous" what portion of the '642 patent is referenced by the '874 patent. Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 162:12-18, 173:24–174:2. As the '642 patent never uses the term "optically pure," it provides no guidance as to what, if anything, is being incorporated to construe that term in the '874 patent.

### (ii)    No LOD Is Incorporated By Reference

On its face, the passage in the '874 patent on which plaintiffs rely does not identify *any* LOD, much less a specific LOD of 0.05%. This "incorporation" passage refers only to a method by which oxaliplatin "may be ***prepared***." Plaintiffs' expert, Dr. Fanfarillo, acknowledged that the "incorporation" passage "talks about processes for resolving and *producing* optically pure oxaliplatin" and does not talk about processes for *analyzing* oxaliplatin. Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 173:8-23 (emphasis added); *see also* Patunas Ex. 24, Oct. 2009 Davies Tr. 577:13-19. Thus, only a preparative method, if anything, is incorporated. *See Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379-80 (Fed. Cir. 2007) (patentee's incorporation language indicates what may be incorporated). But it is analytical methods — not preparative methods — that have LODs. Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 209:22-24. Therefore, no LOD is incorporated.

Moreover, the alleged "incorporation" passage uses the permissive language "***may*** be prepared."  It therefore cannot teach a claim limitation which by definition is essential.  *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1378 (Fed. Cir. 2003) ("'Can' and 'may' are commonly used by patentees to show that a limitation is permissive" and cannot be used to limit the claims).  The passage references a method of preparing oxaliplatin that ***may*** be employed, not a mandatorily employed analytical technique from which to define an LOD.

Plaintiffs are wrong when they argue that the '874 and '642 patents disclose "the same analytical method to measure optical purity."  Pl. Br. 6.  The HPLC methods disclosed in the two patents are *not* identical.  The '874 patent is missing information about analyte concentration and choice of solvent, both of which could affect LOD.  *See* Patunas Ex. 24, Oct. 2009 Davies Tr. 589:19-591:2; Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 237:23 – 238:6, 239:22-25; Wolf Decl. ¶ 15.

Moreover, a person of ordinary skill in the art ("POSA") would not understand the term "optically pure" to depend on any specific LOD, because LOD is impacted by equipment and analysis conditions (*i.e.* sample concentration or the chosen detector).  Wolf Decl. ¶¶ 14-17; *see also* Patunas Ex. 23, Dec. 2008 Davies Tr. 327:11-18.  Any claim construction based on an inherently variable LOD would suffer from this infirmity.  *Id.*

**d.      The Other Alleged Constructions Of "Optically Pure" (≥ 99.97% And ≥ 99.991%) Are Incorrect**

According to plaintiffs, Par and Fresenius argue that "optically pure" means ≥ 99.97% or ≥ 99.991% oxaliplatin by weight, respectively.  Pl. Br. 9.  Because these values rely on an LOD, they are also too variable to be definite, as just explained.  Patunas Ex. 23, Dec. 2008 Davies Tr. 327:11-18; Patunas Ex. 24, Oct. 2009 Davies. Tr. 587-89; Wolf Decl. ¶¶ 14-17.  Indeed, the lack of consensus amongst plaintiffs and defendants, Par and Fresenius, regarding the appropriate

LOD confirms its variability and undermines reliance on LOD to construe the term "optically pure."

Moreover, these proposed values rely on extrinsic evidence that is improper as a matter of law. Par's $\geq$ 99.97% value is based entirely on non-public, confidential information

**REDACTED**                Pl. Br. 9. Such private data simply cannot be used for claim construction. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (claim construction must be based upon publicly available sources). Fresenius' $\geq$ 99.991% value is based entirely on experiments in which their expert modified procedures disclosed in the '874 patent and obtained an LOD of 0.009%. Pl. Br. 9. Claim construction is based on how a POSA would interpret a claim when the patent application was filed, not on an expert's post art experimentation long after the fact. *See Phillips*, 415 F.3d at 1313.

Finally, as explained above, the '874 patent and its prosecution history state that melting point, specific optical rotation, or circular dichroism methods should be used to assess optical purity. None of these analytical methods can distinguish between oxaliplatin that would infringe claim 1 under the constructions discussed above, and oxaliplatin that would not infringe. Therefore, these constructions are inconsistent with, and unsupported by, the '874 patent and its prosecution history.

> **2.      A Substantial Question Of Claim Construction Exists, Providing An Independent Basis For Denying Plaintiffs' Motion**

This Court, which has previously construed the term "optically pure," understands the difficulties inherent in doing so. A substantial question remains as to the proper construction of "optically pure", so denial of the preliminary injunction is appropriate. *See Novo Nordisk A/S v. Sanofi-Aventis U.S. LLC*, 290 F. App'x 334, 337 (Fed. Cir. 2008) (unpublished opinion) ("At the preliminary injunction stage … it is irrelevant whether this case presents greater issues of claim construction or validity — the existence of one or both of these issues is sufficient to justify the district court's decision to deny a preliminary injunction.")

To establish likelihood of success, plaintiffs must show that Teva infringes claim 1 as properly construed.  To the extent this Court rejects plaintiffs' claim construction (as it should), that provides an additional basis for denial of plaintiffs' preliminary injunction motion.  Having argued infringement only under their proposed claim construction, plaintiffs have not met their burden of establishing infringement under any other claim construction, including the alternative constructions addressed in their preliminary injunction brief.

> ### 3.   Under Any Construction Of "Optically Pure," Claim 1 Is Obvious In View Of The Kidani '846 Patent
>
> #### a.   The Kidani '846 Patent Provides Motivation To Purify Oxaliplatin And A Reasonable Expectation That Purified Oxaliplatin Would Possess Beneficial Properties

If the prior art (i) discloses a compound that is the active ingredient of a mixture and (ii) teaches how to purify the compound, then a claim to a purified form of the compound, like claim 1 of the '874 patent, is unpatentable absent unexpected results.  *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301-02 (Fed. Cir. 2007); *see also Ex parte Gray*, 10 U.S.P.Q.2d 1922, 1924-25 (B.P.A.I. 1989); *Ex parte Stern*, 13 U.S.P.Q.2d 1379, 1381-83 (B.P.A.I. 1987).  Thus, a claim to a pure enantiomer is *prima facie* obvious and unpatentable over mixtures containing the enantiomer (*e.g.*, racemic mixtures) unless the pure enantiomer possesses unexpected beneficial properties.  *In re Adamson*, 275 F.2d 952, 954 (C.C.P.A. 1960); *Emory Univ. v. Glaxo Wellcome Inc.*, 44 U.S.P.Q.2d 1407, 1414 (N.D. Ga. 1997) ("[D]isclosure of the racemate or racemic mixture makes *prima* facie obvious the separate enantiomers of that racemate.").  Where, as here, the prior art discloses the process for purifying the enantiomer and its beneficial properties, the *prima facie* obviousness of the compound is even stronger.

The Federal Circuit has set forth the appropriate standards for evaluating obviousness of an enantiomer claim in a case very similar to this one.  The Federal Circuit explained:

> if it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior art would provide a person of ordinary skill in the art with reason to believe that this is so, the purified compound is *prima facie* obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified.

*Aventis,* 499 F.3d at 1301 (citing *In re May*, 574 F.2d 1082, 1090-94 (C.C.P.A. 1978)).  Here, there is no dispute that the Kidani '846 patent taught the desirable activity and lower toxicity of the oxaliplatin enantiomer and would have motivated a POSA to separate oxaliplatin (*l*-OHP) from the undesired (*d*-OHP) enantiomer.[8]  Patunas Ex. 1, '846 patent, Tables 1, 2; Lippard Decl., Ex. A ¶¶ 25-27.  Indeed, the motivation here is even stronger than that in *Aventis*, where the prior art did not teach the activity and lack of toxicity of the specific enantiomer at issue.  *See Aventis*, 499 F.3d at 1302.

With respect to reasonable expectation of success, *Aventis* states that:

> [o]rdinarily, one expects a concentrated or purified ingredient to retain the same properties it exhibited in a mixture, and for those properties to be amplified when the ingredient is concentrated or purified; isolation of interesting compounds is a mainstay of the chemist's art.  If it is known how to perform such an isolation, doing so "is likely the product not of innovation but of ordinary skill and common sense."

*Id.* at 1302 (citing *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 421 (2007)).  Without some unexpected result, a POSA would reasonably expect a purified enantiomer to exhibit the same or amplified properties as it did in the mixture, rendering the purified enantiomer *prima facie* obvious.  *See In re Adamson*, 275 F.2d at 955 (enantiomer claim invalid where activity data established only an expected improvement in activity over the racemic mixture); *see Ex parte*

---

[8]   Even if a specific motivation to achieve oxaliplatin of ≥ 99.95% optical purity by weight is required (as plaintiffs contend), plaintiffs' expert, Dr. Fanfarillo, conceded that a POSA would have been so motivated:  "[T]he presence of any impurities is undesired and the target at the time was .05 percent."  Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 346:20-22.

*Gray*, 10 U.S.P.Q.2d at 1924-25 (requiring unexpected properties for a protein purified by the applicants' method in view of the same protein purified by a prior art method).

Contrary to plaintiffs' allegations, the Kidani '846 patent not only taught POSAs the desirability of optically purifying the racemic mixture to obtain oxaliplatin; it disclosed a step-by-step process for "isolating and purifying" *l*-DACH and synthesizing *l*-OHP (oxaliplatin) therefrom.  Patunas Ex. 1, '846 patent, 3:17-33, Ex. 1-4.[9]  A POSA reading the Kidani '846 patent would have recognized as much.  A POSA would also have understood that the goal of the Kidani '846 patent was to achieve the purest oxaliplatin possible.  Patunas Ex. 26, Oct. 2008 Fahrni Tr. 153:24-154:5; Patunas Ex. 27, Cleare Tr. 86:23-24, 87:18-21, 242:4-6, 243:2-4.  In addition, a POSA would have understood a claim to an enantiomer without further limitation (such as the sole claim of the Kidani '846 patent) to mean "very high" optical purity, "100 percent if possible, but … as pure as can reasonably be obtained for a product at [that] time." *See, e.g., Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 729-30 (N.D. W. Va. 2004), *aff'd*, 161 F. App'x 944 (Fed. Cir. 2005); *see also* Patunas Ex. 27, Cleare Tr. 89-90. This, in addition to the known desirable properties of oxaliplatin, is all that is necessary to show obviousness.  *See Aventis*, 499 F.3d at 1302 (finding an enantiomer obvious where the prior art disclosed a desirable property for the enantiomer and "specifically taught" that it could be prepared by conventional methods).

Furthermore, apart from the detailed protocol set forth in the Kidani '846 patent, a POSA would have drawn upon the extensive knowledge readily available in the prior art concerning the

---

[9]   Sanofi's assertion — made for the first time in their opening brief — that the steps required to synthesize oxaliplatin from optically pure DACH "could change the optical purity of the resultant oxaliplatin product" (Pl. Br. 18) is unsupported by any scientific explanation and is inconsistent with expert testimony.  D232-3, Oct. 2008 Davies Rpt. ¶ 59; Lippard Decl., Ex. A ¶ 44.

fractional crystallization method disclosed by Kidani.  By the early 1970s, long before the filing

of the application for the '874 patent, preparation of "optically pure" *l*-DACH using fractional

recrystallization was "a routine experiment for a person of ordinary skill in the art."  Armstrong

Decl., Ex. A ¶¶ 24-27, 58-59.  Scientists working in the field before the filing date of the '874

patent application understood that *l*-OHP (oxaliplatin) could be made from pure *l*-DACH.  For

example, Speer, citing to Kidani's work, reported in 1978 that "[p]latinum coordination

complexes have been synthesized from ***pure*** trans (-)-R,R- [trans-*l*], trans (+) -S,S- [trans-*d*] and

cis-1,2-diaminocyclohexane [DACH]."  Patunas Ex. 5, Speer *et al.*, J. Clin. Hematol. Oncol.,

8(2):44-50 at 48 (1978) ("Speer") (emphasis added).  Speer explained that "racemic trans DACH

was successfully resolved into the two optical isomers," and that oxaliplatin (among other

isomers) was prepared "from the ***pure*** individual DACH isomers by standard methods."  *Id*. at

45 (emphasis added).  Similarly, in 1987, Vollano reported oxaliplatin made in accordance with

Kidani *et al*. as a platinum (II) compound "containing the ***isomerically pure*** form[] of DACH."

Patunas Ex. 6, Vollano *et al.*, J. Med. Chem., 30(4):716-9 at 717 (1987) ("Vollano") (emphasis

added).

      **REDACTED**

---

10   The Ph.D. chemist author of this memorandum possessed the qualifications of a POSA
     under plaintiffs' definition.  *See* D232-3, Oct. 2008 Davies Rpt. ¶¶ 18-20; Patunas Ex. 28,
     Mar. 2009 Fanfarillo Rpt. ¶¶ 12-13; Patunas Ex. 29, Hamel Decl. ¶¶ 1-2, Ex. A.

REDACTED

D233-6, ELOX1502803-07 at ELOX1502804 (emphasis added).  Plaintiffs' statement that

"defendants' own experts cite no evidence of a known or obvious way for a POSA to obtain

optically pure oxaliplatin" (Pl. Br. 14) ignores all of this evidence.

> **b.      Plaintiffs' Allegations Regarding "Unpredictability" In Achieving Successful Purification Are Unsupported And Legally Irrelevant**

Plaintiffs allege that fractional crystallization is "unpredictable" because it "involves

much experimentation to achieve a successful purification."  Pl. Br. 18-19.  While "screening

experiments" to determine resolution conditions may be necessary in some cases, they are not

necessary here.  The Kidani '846 patent and other prior art references had already mapped out

detailed fractional crystallization conditions for purifying *l*-DACH using tartaric acid as the

resolving agent.  Patunas Ex. 1, '846 patent, 3:33, 14:53-15:20; Armstrong Decl., Ex. A ¶ 27.

No unpredictability remained.  Armstrong Decl., Ex. A ¶ 27.  Even the '874 patent referred to the

fractional crystallization method of Kidani as "conventional."  Patunas Ex. 22, '874 patent, 4:1,

7:58.

Repetitions by Teva's expert, Dr. Fahrni, of the method for producing oxaliplatin taught

by the Kidani '846 patent confirm that no significant experimentation was required to obtain

optically pure oxaliplatin by the conventional Kidani process.  *See* Armstrong Decl., Ex. A ¶ 61.

In November 2008, Dr. Fahrni faithfully followed the teachings of the Kidani '846 patent and

synthesized > 99.98% optically pure oxaliplatin by weight.  Patunas Ex. 3, Second Supp. Fahrni

Rpt. at 2 and attached notebook pages; Patunas Ex. 4, Feb. 5, 2009 Richter Decl. ¶¶ 9-10.[11]  In

January 2009, to address alleged deviations from the teachings of the Kidani '846 patent raised

by plaintiffs during his December deposition, Dr. Fahrni repeated his synthesis with slight

modifications and again obtained oxaliplatin that was > 99.98 % optically pure.  Patunas Ex. 2,

Feb. 2009 Fahrni Decl. ¶¶ 4, 5, 8, 9; Patunas Ex. 4, Feb. 5, 2009 Richter Decl. ¶¶ 9-10.  Notably,

plaintiffs do not challenge, or even mention, this repetition in the reports of their experts or in

their preliminary injunction papers.

**REDACTED**


Thus, as in *Aventis*, the prior art knowledge regarding fractional crystallization

provided a specific method for making the claimed purified enantiomer.  *Aventis*, 499 F.3d at

1302 (finding that the prior art taught that stereoisomers of ramipril could be separated by

"conventional chromatographic or fractional crystallization methods" and was therefore within

the grasp of a POSA).

Plaintiffs ignore this clear evidence and instead rely on so-called "repetitions" by the

inventors (*e.g.* '874 patent, Ex. 2)[12] **REDACTED**            said to illustrate the unpredictability of

---

[11]   The same HPLC methodology used to measure the purity of defendant Pliva's ANDA
product was used to measure the purity of Dr. Fahrni's oxaliplatin.  Patunas Ex. 4, Feb. 5,
2009 Richter Decl. ¶¶ 9-10.  Plaintiffs, having relied solely on the results of optical purity
measurements using the HPLC methodology from Pliva's ANDA to assert infringement
(D185, Feb. 2009 Davies Rpt. ¶¶ 31-33; Patunas Ex. 24, Davies Oct. 2009 Dep. Tr. 565:17 –
567:9), have no basis for challenging the optical purity measurements of Dr. Fahrni's
oxaliplatin using that same methodology.

[12]   Plaintiffs never provided any laboratory documentation confirming how they "repeated" the
Kidani prior art nor how they analyzed the results of that "repetition."  This is a glaring

practicing the Kidani method. Pl. Br. 9-10, 12 n.8. However, in preparing the *l*-DACH starting

material, unlike Dr. Fahrni (and the Kidani method itself), neither the inventors' "repetition"

**REDACTED**

Patunas Ex. 24, Oct. 2009 Davies. Tr. 631:16-23, 632:18-633:5;

Patunas Ex. 22, '874 patent, 5:55-57.

Plaintiffs also contend that "optically pure" oxaliplatin is nonobvious because there was

no pre-existing analytical "HPLC method to measure optical purity" of the oxaliplatin product.

Pl. Br. 18. This is irrelevant.[13] What is claimed is a purified compound, not an analytical

method for measuring its purity. All that is necessary for *prima facie* obviousness of a claim to a

purified compound is a showing that the optically purified compound would have been expected

to exhibit similar or amplified properties as compared to the compound in impure form. *Aventis,*

499 F.3d at 1301 ("if the prior art would provide a person of ordinary skill in the art with reason

to believe [that some desirable property of a mixture derives in whole or in part from a particular

one of its components] … the purified compound is *prima facie* obvious over the mixture"). The

Kidani '846 patent's express disclosure that *l*-OHP (oxaliplatin) exhibits greater activity and

lower toxicity than *d*-OHP creates such an expectation. Moreover, the Federal Circuit has found

that so long as there is a reasonable expectation of success in making the product, proof of

success is not necessary; mere verification of a predictable result does not confer patentability.

---

omission in view of plaintiffs' admission that the specification of contemporaneous U.S.
Patent No. 5,420,319 patent ("the '319 patent") states that the Kidani process yielded
oxaliplatin with an optical purity of 99.0% e.e. (99.5% by weight) (D91-3, Pl. Resp. to
Mayne Statement of Undisputed Fact No. 45). This admission undercuts plaintiffs'
assertion that the Kidani process yields only 90.0% e.e. (95% by weight) oxaliplatin.

[13] Expert testimony shows that a POSA, through routine experimentation, could have used
analytical HPLC methods to measure the optical purity of oxaliplatin and/or to measure the
optical purity of the DACH starting material as a proxy for the optical purity of oxaliplatin.
Armstrong Decl., Ex. A ¶¶ 15, 36-37, 47-49, 53; Patunas Ex. 30, Armstrong Tr. 59-60,
64-65, 102-03; Lippard Decl., Ex. A ¶ 45.

*See, e.g., PharmaStem v. Via Cell*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007) ("Scientific confirmation of what was already believed to be true may be a valuable contribution, but it does not give rise to a patentable invention").

> ### c. Plaintiffs' Arguments Based On Secondary Considerations Of Non-Obviousness Are Meritless And Unsupported

As explained above, the "optically pure" oxaliplatin enantiomer of claim 1 of the '874 patent is *prima facie* obvious.  Plaintiffs bear the burden of rebutting this *prima facie* obviousness with evidence of secondary considerations, and must show unexpected results. *Aventis*, 499 F.3d at 1301, 1303.

Plaintiffs do not, because they cannot, provide any evidence of unexpected results. Instead, plaintiffs make meritless assertions of other secondary considerations.  First, plaintiffs assert commercial success.  Pl. Br. 20.  But, plaintiffs fail to establish the requisite nexus between the negligible increase (if any) in optical purity of the claimed oxaliplatin over the prior art and the sales of plaintiffs' oxaliplatin product.  *See Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004).  Indeed, there is no clinical significance to selling an oxaliplatin product having less than 0.05% *d*-OHP.  Plaintiffs themselves admit that

**REDACTED**

Thus, the commercial

success of plaintiffs' oxaliplatin does not relate in any way to its marginal increase in optical

purity over the prior art.[14]  Armstrong Decl., Ex. B ¶¶ 26, 30.

      Second, plaintiffs allege failure of others.  Pl. Br. 20.  As explained above, the

"repetitions" on which plaintiffs rely did not faithfully follow Kidani and therefore do not

evidence failure of others.  In contrast, Dr. Fahrni's faithful repetitions show that a POSA could

have made "optically pure" oxaliplatin by following the teachings of the Kidani '846 patent.

      Third, plaintiffs assert — based only on a bare allegation of infringement — that

defendants copied the claimed invention.[15]  Pl. Br. 20.  This is not sufficient to establish copying.

*Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1225-26 (D. Nev. 2008) ("A bare

allegation of infringement of a patent is not sufficient" to establish copying).  According to the

Federal Circuit:  "Not every competing product that arguably falls within the scope of a patent is

evidence of copying.  Otherwise every infringement suit would automatically confirm the

nonobviousness of the patent."  *Iron Grip*, 392 F.3d at 1325.  Plaintiffs state that "all of the

defendants are free to make oxaliplatin that is not "optically pure," *e.g.*, 99.90% pure by weight,

but none of them have chosen to do so."  Pl. Br. 20.  This is irrelevant.  Even if the Court were to

construe "optically pure" to mean ≥ 99.95% oxaliplatin by weight, there is no indication that "all

of the defendants" knew of that claim construction and developed their products accordingly.

Indeed, as explained above, nothing in the '874 patent or its prosecution history provides

---

[14]   The contemporaneous '319 patent states that the Kidani process yielded oxaliplatin with an
optical purity of 99.0% e.e. (99.5% by weight; 0.5% *d*-OHP by weight).  D474-6, '319
patent, Table 1, 8:16-39; Armstrong Decl., Ex. B ¶ 28.  As oxaliplatin with an optical purity
of 99.95% by weight (0.05% *d*-OHP) differs from the Kidani process oxaliplatin of the '319
patent by less than **REDACTED**
       *See* D277, Sanofi Position Paper, ELOX0384457-72 at ELOX0384463.

[15]   The opinions of plaintiffs' expert, Dr. Fanfarillo, regarding copying deserve no weight,
because Dr. Fanfarillo admitted that he did not understand the difference between
infringement and copying.  Patunas Ex. 25, Oct. 2009 Fanfarillo Tr. 339:17-19.

competitors any guidance regarding the meaning of "optically pure" so that competitors could design around the '874 patent.  *See* Armstrong Decl., Ex. B ¶ 33.

For all of these reasons, plaintiffs can neither overcome Teva's strong showing of obviousness nor prove that Teva's obviousness defense lacks substantial merit.

### B.    Plaintiffs Will Not Suffer Irreparable Harm

### 1.    This Court Has Already Found That Plaintiffs Will Not Be Irreparably Harmed By Sales Of Teva's Generic Oxaliplatin Product

In denying plaintiffs' motion for a stay pending appeal, this Court considered extensive evidence regarding the alleged irreparable harm that a generic launch would cause plaintiffs. This Court correctly concluded that such harms were compensable and speculative at best:

> With respect to financial harm, the Court finds that Plaintiffs' alleged potential loss of market share and revenue are not irreparable.  Plaintiffs have not shown that any such potential harms are incalculable and not compensable by money damages. Furthermore, many of the alleged harms that Plaintiffs claim will flow from the loss of revenues appear speculative at best.

D416, July 1 Op. at 5-6.

None of the facts relevant to this analysis has changed.  Moreover, as demonstrated below, plaintiffs' speculative harms have not materialized, and plaintiffs' predictions of market impact were exaggerated.  Consequently, there is an even stronger basis now than months ago for concluding that plaintiffs have not suffered, and will not suffer, irreparable harm.[16]

---

[16]   The existence of the Sun license agreement would further negate any finding of irreparable harm if it shows that plaintiffs are willing to forego their right to exclude competition for monetary payments.  *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).  Teva and Mayne requested that plaintiffs produce a copy of their license with Sun (Patunas Ex. 32, 10/04/09 E-mail; Patunas Ex. 33, 10/07/09 E-mail).  Plaintiffs – who have control over the license, have not produced it.  As such, an adverse inference that the license agreement negates irreparable harm should attach.  *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

Plaintiffs argue that "in granting plaintiffs' motion to stay … the Federal Circuit found that plaintiffs would be irreparably harmed by a generic product launch."  *See* Pl. Br. 2, 24-25, 27.  This is not so.  The Federal Circuit's single-sentence order granting plaintiffs' motion for a stay pending appeal provided no factual findings on irreparable harm and no commentary on this Court's irreparable harm findings — the only findings relevant to this issue.  Therefore, this Court's findings control.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (holding that Supreme Court could properly rely on district court's factual findings when considering propriety of injunctive relief, where the Ninth Circuit's four-sentence interlocutory order failed to provide any factual findings or justification supporting its grant of injunctive relief).  Since the Federal Circuit did not criticize this Court's findings on irreparable harm, there is no reason for this Court to reconsider such findings.

Finally, plaintiffs' actions are inconsistent with their irreparable harm allegations.  Had plaintiffs truly believed that they would be irreparably harmed by a generic launch, they would have sought an injunction pending appeal ***immediately*** upon this Court's entry of final judgment or ***immediately*** upon FDA's final approval of defendants' products – not weeks or months later.

**2.     Sanofi's Irreparable Harm Predictions Were Exaggerated And Remain Far Too Speculative To Support Grant Of A Preliminary Injunction**

Plaintiffs' expert, Dr. Grabowski, **REDACTED**

D389,
June 2009 Grabowski Decl. ¶ 34.  Teva's expert, Dr. Addanki, explained that even if true, such a price drop would not be irreversible or cause Sanofi irreparable harm.  D407-3, June 2009 Addanki Decl. ¶¶ 15-24.  This Court agreed.

In his more recent declaration, Dr. Grabowski **REDACTED**

**REDACTED**

D482, Grabowski PI Decl. ¶¶ 6-7.  It is implausible to suggest that such a relatively modest price drop is irreversible, much less irreparable by an award of money damages.  Addanki PI Decl. ¶ 6.

Furthermore, Sanofi's decision to license Ebewe and Sun is inconsistent with its irreparable harm contentions.  Addanki PI Decl. ¶ 13.  If Sanofi truly believes that generic presence in the market, albeit temporary, will cause irreversible price erosion, then licensing Ebewe and Sun is illogical because doing so will also contribute to such alleged irreversible price erosion.  Addanki PI Decl. ¶ 13.  Indeed, Dr. Grabowski asserts that without a preliminary injunction, prices will continue to erode because competition from Ebewe will cause prices to decline.  D482, Grabowski PI Decl. ¶ 8.  The same logic would apply to Sun.

Dr. Grabowski previously asserted that **REDACTED**

D389, June 2009 Grabowski Decl. ¶ 12.  Dr. Grabowski implied that these allegedly irreparable harms would ripen shortly after generic entry.  D389, June 2009 Grabowski Decl. ¶ 11.  However, Dr. Addanki disagreed, explaining why a rational company in Sanofi's shoes **REDACTED**

D407-3, June 2009 Addanki Decl. ¶ 21.  Dr. Grabowski now declares that Sanofi considered the above actions but put them in abeyance pending the Court's ruling on the preliminary injunction motion.  D482, Grabowski PI Decl. ¶ 17.  Thus, Dr. Addanki's reasoning was, and remains, correct:  If Sanofi believes it will prevail in this

litigation, then it has no reason to **REDACTED**

even if this Court denies preliminary injunctive relief.  Addanki PI Decl. ¶ 6.

Finally, Sanofi's message to its shareholders through the press is crystal clear:  generic

entry will have no material effect on the company.  On August 12, 2009, the day after Teva and

Mayne launched their generic oxaliplatin products, Reuters quoted a Sanofi spokesman as

stating:  "Sanofi is not issuing a revised 2009 guidance as a consequence of generic entry of

oxaliplatin in the U.S."  Patunas Ex. 34, Aug. 12 Reuters Article.

For all of the reasons set forth in the Addanki declaration, Sanofi's speculative harms are

not irreparable, but rather calculable and reparable.  Addanki PI Decl. ¶ 7.  Furthermore, Teva

undisputedly is capable of paying any damages that arise if Teva is found liable for infringement.

Addanki PI Decl. ¶ 7; D407-4, Berlanska Decl. ¶ 6.  Thus, Sanofi's alleged harms do not justify

a preliminary injunction.

### 3.    Debiopharm's Irreparable Harm Predictions Were Exaggerated And Are Too Speculative To Support Grant Of A Preliminary Injunction

Debiopharm's harm, like Sanofi's, is reparable.  Dr. Grabowski does not offer any new

arguments to support plaintiffs' claims that Debiopharm will suffer irreparable harm.  Addanki

PI Decl. ¶ 9.  Debiopharm's alleged harms are calculable and compensable.  D407-3, June 2009

Addanki Decl. ¶¶ 25-31.  Furthermore, if Debiopharm believes it will prevail in this litigation,

**REDACTED**                                                             D407-3, June 2009 Addanki Decl.

¶ 29; Addanki PI Decl. ¶ 9.  And, as explained above in relation to Sanofi, the decision to license

Ebewe and Sun is inconsistent with Debiopharm's irreparable harm contentions.  Addanki PI

Decl. ¶ 13.

In fact, there is no evidence that Debiopharm has suffered the irreparable harms plaintiffs

previously identified.  *See* D389, Grabowski June 2009 Decl. ¶ 45.  Tellingly, other than loss of

revenues, Dr. Grabowski does not identify any non-speculative harm that Debiopharm has

suffered.  Indeed, Debiopharm recently announced an exclusive license agreement with Ipsen for

the development and commercialization of an anti-cancer agent.  Patunas Ex. 35, Oct. 2009

Debiopharm Press Release.  This agreement rebuts Debiopharm's speculation

**REDACTED**                                               in the absence of a preliminary injunction.

Addanki PI Decl. ¶ 9.  Thus, Debiopharm's alleged harms do not justify a preliminary injunction.

### C.    The Harm To Teva, Like The Harm To Plaintiffs, Is Reparable – But Only If Plaintiffs Post An Appropriate Bond

As this Court previously recognized:  "The potential harm to Defendants by an

injunction, like the potential harm to Plaintiffs absent an injunction, is in large part not

irreparable."  D416, July 01 Dist. Ct. Op. 6.  This is true only if plaintiffs post a bond sufficient

to compensate defendants for any harm.  Plaintiffs acknowledge as much.  After filing their

injunction motion, plaintiffs submitted a declaration suggesting amounts for a bond.  D497,

Grabowski PI Bond Decl. ¶ 16.  As Dr. Addanki explains, like the bond amounts that Dr.

Grabowski proposed in conjunction with plaintiffs' motion to this Court for a stay pending

appeal, Dr. Grabowski's current bond amounts are based on arbitrary assumptions that are

unlikely to be realized.  Addanki PI Decl. ¶¶ 14-16.  If the Court grants a preliminary injunction

(which it should not), Teva will make a submission regarding the appropriate amount of the

bond.

### D.    The Grant Of A Preliminary Injunction Will Irreparably Harm The Public

Only the *grant* of a preliminary injunction (effectively reestablishing the monopoly

pricing of oxaliplatin) can cause any irreparable harm.  If a preliminary injunction issues and

Teva ultimately prevails, then patients, their employers and their insurers will have paid

plaintiffs' monopoly prices during the time that Teva was enjoined, rather than Teva's generic

price.  Without any realistic prospect for requiring disgorgement of these monopoly profits, this constitutes an irreparable economic harm *to the public*.  *See* D407-3, June 2009 Addanki Decl. ¶ 35.  Moreover, there is no public benefit from the enforcement of an invalid, clinically insignificant patent whose alleged contribution to the art is, at best, obvious.  Therefore, no preliminary injunction should issue.

## II.    THE EXTREME REMEDY OF RECALL IS NOT WARRANTED

### A.    Plaintiffs Cannot Satisfy The Requirements For A Preliminary Injunction; Therefore, No Recall Is Warranted

Recall is "an extreme remedy" and the court's power to order a recall must be "sparingly exercised."  *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976); *Novo Nordisk, Inc. v. Eli Lilly*, No. 96-5787, 1996 U.S. Dist. LEXIS 12807, at *33 (S.D.N.Y. Aug. 30, 1996).  Recall is more drastic than a prohibitory injunction because it requires a party to take affirmative steps.  As such, recall is clearly disfavored.  *Spectro*, 544 F.2d at 1181; *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

To obtain a recall, the movant must meet a "higher standard" – a standard beyond what is ordinarily required for a preliminary injunction.  *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008); *O Centro*, 389 F.3d at 975.  For example, courts have required consideration of additional factors, such as the willfulness of the infringement and the risk of serious harm to the public.  *Spectro*, 544 F.2d at 1181 (requiring irreparable harm to public); *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 233 (3d Cir. 2003) (trademark case requiring consideration of intentional or willful infringement and danger to the public).

Plaintiffs have met neither the basic requirements for a preliminary injunction (as explained above) nor the heightened standard for mandatory relief.  Therefore, recall is not warranted.

**B.    Reparable Economic Harm To Plaintiffs Does Not Outweigh The Irreparable Harm A Recall Would Cause Teva And The Public**

To obtain a recall, plaintiffs must show that (1) their injury, absent a recall, outweighs the injury to Teva, and (2) the harm to the public absent a recall will be irreparable.  *Novo Nordisk*, 1996 U.S. Dist. LEXIS at *33 (recall denied where damage to non-movant's reputation outweighed irreparable harm to movant); *Spectro*, 544 F.2d at 1181 (district court erred by ordering recall without a specific finding of irreparable injury to the public).  Plaintiffs cannot make either showing.[17]

As this Court previously found, plaintiffs only face compensable economic harm.  *See supra* p.23.  On the other hand, a product recall requested six weeks after market entry will irreparably damage Teva's reputation and relationships with customers, potentially affecting sales of products other than oxaliplatin.  Kafer Decl. ¶¶ 6, 10; *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating.").  A recall would leave a lasting impression in the minds of Teva's customers, as well as the consuming public, that Teva's generic oxaliplatin is unsafe, the typical reason for a recall.  Kafer Decl. ¶ 6; *see J & J Snack Foods, Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 158-59 (D.N.J.

---

[17]   Plaintiffs' reliance on *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070 (N.D. Cal. 1998), is inapposite.  In *Cybermedia*, irreparable harm was presumed and a recall was needed to prevent a "multiplicity of actions" by the plaintiff against distributors of the infringing product.  *See Cybermedia*, 19 F. Supp. 2d at 1079.  Here, irreparable harm is not presumed (*see eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006)) and there is no "multiplicity of actions" issue.

2001).  **REDACTED**

Teva's oxaliplatin product has been received by its customers who have re-sold or distributed significant quantities to over a thousand of their customers, making recall logistically difficult.  Kafer Decl. ¶ 11.  Indeed, Plaintiffs' delay in seeking recall has resulted in the widespread distribution of Teva's product, thus increasing the expense and impact of any recall (Kafer Decl. ¶ 12) and tipping the balance of the equities even further in Teva's favor.  *See NBA Props. v. Untertainment Records LLC*, No. 99-2933, 1999 U.S. Dist. LEXIS 7780, at *16 (S.D.N.Y. May 26, 1999); *see also PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 413 (S.D.N.Y. 1989).  Moreover, all recalled Teva product would have to be destroyed (Kafer Decl. ¶ 11.C.), which also weighs against recall.  *See Novo Nordisk*, 1996 U.S. Dist. LEXIS at *34 n.31.

Teva's product also poses no health risk that requires recall.  In contrast, the additional handling of oxaliplatin during its recall and destruction would unnecessarily expose handlers to this cytotoxic agent.  Kafer Decl. ¶ 13.

Finally, a recall of Teva's lower cost generic oxaliplatin will irreparably harm the public who, in the absence of Teva's product, will have no choice but to pay plaintiffs' monopoly price for oxaliplatin.  *See supra* pp.27-28.  Any compensable economic harm to plaintiffs absent a recall is outweighed by the irreparable harm a recall would cause Teva and the public.

    **C.**    **Teva's Transparent Actions Taken In Good Faith Do Not Support A Recall**

Recall is not appropriate absent some "egregious conduct by the defendant or when motivated by additional public policy considerations."  *NBA Props.*, 1999 U.S. Dist. LEXIS at *31 (citing *Perfect Fit Indus. v. Acme Quilting Co.*, 646 F.2d 800 (2d Cir. 1981) (recall warranted where defendant intentionally infringed trade dress)).  Here, plaintiffs identify neither egregious conduct nor public policy considerations warranting recall.

Teva's actions have been the antithesis of egregious.  Before launch, Teva obtained a final judgment of non-infringement, provided plaintiffs with prompt advance notice of intent to launch, and waited until the D.C. District Court denied plaintiffs' motion to enjoin FDA and the Federal Circuit denied plaintiffs' request for enforcement of the Federal Circuit's stay pending appeal.  Plaintiffs, having delayed six weeks in seeking a preliminary injunction and recall against Teva, cannot now complain that Teva has sold a large amount of oxaliplatin product. Teva's sales constitute ordinary business practice and not "flooding" as plaintiffs contend.  Kafer Decl. ¶ 4.

Teva's transparency and plaintiffs' delay distinguish this case from *Ortho-McNeil* and *Rohm & Haas*, cases on which plaintiffs rely.  Pl. Br. 26-27.  *Ortho McNeil Pharm., Inc. v. Barr Labs., Inc.*, No. 03-4678, 2009 U.S. Dist. LEXIS 62721 (D.N.J. July 22, 2009), involved a launch prior to a district court finding of non-infringement or invalidity, ***immediately*** followed by an Ortho preliminary injunction motion.  *Id.* at *2-3.  Here, the launch was well after the district court decision and six weeks before plaintiffs sought an injunction against Teva.  *Rohm & Haas Co. v. Cumberland Chem. Corp.*, No. 82-1241, 1983 U.S. Dist. LEXIS 19879 (S.D. Tex. Jan. 21, 1983) involved a launch even though the patent-in-suit had previously been found valid and infringed by several of the same defendants in a separate litigation.  *Id.* at *9-10.  No such facts exist here.  Thus, recall is not warranted.

While Teva's conduct weighs against a recall order, plaintiffs' own conduct provides an additional reason to deny it.  *Kraft Gen. Foods Inc. v. Friendship Dairies Inc.*, No. 91-2276, 1991 U.S. Dist. LEXIS 18213, at *15-16 (S.D.N.Y. June 27, 1991) ("delay is a relevant consideration in determining whether to issue a recall order.")  Plaintiffs' three month delay in seeking a preliminary injunction weighs against ordering a recall.  Had plaintiffs sought and

obtained an injunction at the first opportunity – when this court entered judgment – there would

be no need to consider a recall order.  Instead, plaintiffs attempted to obtain the benefits of a

preliminary injunction without shouldering the burdens of establishing a basis for injunctive

relief.  Plaintiffs' attempted "end around" failed, and as permitted by law, Teva launched its

product.  For plaintiffs now to obtain an injunction and recall order would visit far greater harm

on Teva, its customers, and the cancer patients who depend on Teva's lower cost oxaliplatin

product.  Thus, the equities weigh heavily against ordering a recall.

## CONCLUSION

For all the reasons set forth above, plaintiffs' motion for a preliminary injunction and

recall order should be denied.

**LITE DEPALMA GREENBERG & RIVAS, LLC**

Dated:  October 20, 2009

By:___/s/ *Michael E. Patunas*___
Allyn Z. Lite
Michael E. Patunas
Mayra V. Tarantino
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel:  (973) 623-3000
E-Mail:
  alite@ldgrlaw.com
  mpatunas@ldgrlaw.com
  mtarantino@ldgrlaw.com

*Attorneys for Defendants Teva Parenteral Medicines,*
*Inc., Teva Pharmaceuticals USA, Inc., Pharmachemie*
*B.V., Barr Laboratories, Inc., and Pliva-Lachema a.s.*

**GOODWIN PROCTER LLP**
David M. Hashmall, Esq.
Frederick H. Rein, Esq.
Keith A. Zullow, Esq.
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333
E-Mail:
  dhashmall@goodwinprocter.com
  frein@goodwinprocter.com
  kzullow@goodwinprocter.com

**GOODWIN PROCTER LLP**
Emily L. Rapalino, Esq.
Exchange Place
Boston, MA 02109
Tel.: (617) 570-1000
Fax:  (617) 523-1231
E-Mail:
  erapalino@goodwinprocter.com

220963 v1